[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15205

_____

D.C. Docket No. 8:12-cr-00045-MSS-AEP-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SAMI OSMAKAC,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 18, 2017)

Before HULL, MARCUS, and MARTIN, Circuit Judges.

HULL, Circuit Judge:

Appellant-defendant Sami Osmakac appeals his two convictions and forty-year sentence for attempting to carry out a terrorist plot in Tampa, Florida and for possessing a firearm not registered to him. As early as December 2010, the Federal Bureau of Investigation ("FBI") conducted surveillance of Osmakac, authorized pursuant to the Foreign Intelligence Surveillance Act ("FISA") and approved by the FISA Court. 50 U.S.C. § 1801, et seq. The FBI surveillance showed that Osmakac had been expressing extremist Islamist views and planning to conduct a "payback" attack for the United States's killing of Osama Bin Laden. A follow-up FBI undercover investigation revealed that Osmakac had also been acquiring firearms, grenades, and materials for a makeshift car-bomb.

On January 7, 2012, FBI agents arrested Osmakac before he could carry out his terrorist plot. On June 10, 2014, following a 10-day trial, a jury convicted Osmakac of attempting to use weapons of mass destruction against U.S. persons or property, in violation of 18 U.S.C. § 2332a(a)(2) ("Count 1"), and possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d), 5871 ("Count 2"). The district court sentenced Osmakac to 480 months' imprisonment on Count 1 and 120 months' imprisonment on Count 2, to run concurrently.

Osmakac raises three issues on appeal. First, Osmakac argues that the district court erred in denying him access to certain FISA materials governing his surveillance. Second, Osmakac argues that the prosecutor's misstatements during

2

closing argument made the trial so unfair as to deny Osmakac his constitutional right to due process. Third, Osmakac argues that the district court erred in failing to consider a downward departure based on the government's purported sentencing factor manipulation.

After thorough review, and with the benefit of oral argument, we affirm Osmakac's convictions and sentence.

## I.  BACKGROUND

We first review the relevant evidence presented during Osmakac's 10-day jury trial.

### A.    Osmakac's Radicalization

Osmakac is a naturalized citizen of the United States who was born in the former Yugoslavia, now Kosovo. As of December 2010, Osmakac demonstrated a commitment to Islamist extremism.

For example, in December 2010, the FBI began intercepting telephone discussions between Osmakac and a known Islamist extremist, Russell Dennison. During these conversations, Osmakac discussed his Islamist extremist beliefs with fellow extremist Dennison. Osmakac threatened violence to people who criticized the religious videos that Osmakac posted online. Dennison told Osmakac that these critics were "atheists" who "think everything is a joke." Osmakac replied that the critics would "see what the joke" was when "the black flags come on top of

everybody's head and the head flies off," a reference to beheadings under a certain interpretation of Islamic law. In one conversation, Osmakac praised the work of Shaykh Anwar al-Awlaki, an al-Qaeda author who wrote and helped produce articles about jihad. Osmakac told Dennison that he read a "beautiful" article by al-Awlaki that reflected Osmakac's thoughts and beliefs. In that article, introduced at trial, al-Awlaki asserted that Muslims in the West have the right to steal money from non-Muslims as a way to raise money for jihad.

In March 2011, Osmakac left his job in Tampa and traveled overseas in an attempt to fight the United States and its allies. Osmakac stated that the trip was "his idea" and left abruptly, without telling his family or packing proper clothing. Osmakac originally hoped to go to Afghanistan "and fight the oppressors," as he described "America and [its] Nato allies." Osmakac first flew to Turkey and then to Turkmenistan, on Afghanistan's western border. However, Osmakac was denied entry into Turkmenistan because he did not have the proper travel documents. Osmakac then returned to Turkey and tried unsuccessfully to enter Iraq. Osmakac attempted to reach Iraq by crossing through Syria, on Turkey's southern border, but failed to gain entry into Syria. Following this failure to get to Iraq, Osmakac returned to the United States. Osmakac called his family from overseas in order to get money for his return flight.

Upon his return, Osmakac went to Chicago, Illinois and lived with a friend for the summer of 2011. Osmakac worked a number of temporary jobs, each of which lasted no longer than "a couple months."

During this period, Osmakac drew the suspicion of members in the local Muslim community. On two consecutive Fridays in June and July 2011, Osmakac confronted the leader of a mosque in Naperville, Illinois, a Chicago suburb. On the first Friday, the mosque leader delivered a sermon which stated that, if Osama Bin Laden "did what he did," then he "deserved to be . . . punished." After the sermon, Osmakac approached the mosque leader and told him that he needed to apologize for the sermon. Osmakac raised his voice and criticized the mosque leader for "supporting . . . the U.S. Government against [Osama Bin Laden]."

The next Friday, the mosque leader greeted Osmakac at the mosque, but Osmakac refused to shake hands with the mosque leader. Osmakac told the mosque leader that he was "kuffar," or an infidel, and that Osmakac was "allowed to kill [him]" and take his "women and [his] money." Osmakac repeated his threats before two board members of the mosque, stating, "[y]ou are kuffar, you're supporting him against us as Muslims and, you know, we're going to kill all of you . . . . [T]his is our duty to do this to you." The mosque leader replied that this was a misinterpretation of Islamic law. Osmakac responded: "Your interpretation is the American interpretation of the Quran."

5

Several mosque members reported Osmakac and his confrontations with them to the police, but the police did not arrest Osmakac.

Eventually, Osmakac left Chicago and traveled to Tampa. On September 23, 2011, while in Tampa, Osmakac met a man who owned a store that sold trinkets and food items from the Middle East. Osmakac went to the man's store and asked the man for a job; however, Osmakac also asked about purchasing "black flags," a reference to flags used by a variety of Islamist political movements. The store owner gave Osmakac a job cleaning freezers and helping to maintain the store. However, on September 28, 2011, the store owner reported Osmakac's comments about black flags to the FBI.

Following the report, the store owner agreed to become a confidential source ("CS") and provide information about Osmakac to the FBI.[1]

## B.    Osmakac's Terrorism Plot

From November 2011 to January 2012, the FBI recorded numerous conversations in which Osmakac discussed plans to commit a violent terrorist attack.

Per the recorded conversations, Osmakac first tried to obtain guns. In late November 2011, Osmakac traveled to St. Petersburg, Florida and "talked to some

---

[1]From October 2011 through December 2011, the FBI paid the CS approximately $24,000 to conduct informant work related to Osmakac. The CS did not testify at trial. Osmakac was afforded an opportunity to depose the CS but declined to do so.

drug dealers" to see if they had "bodies," coded language for guns used in murders or homicides. Osmakac asked about "bodies" at one location but left because he believed that "[t]here was an informant" who was "filming [him] from behind." Osmakac also believed that somebody "took [his] tag" and reported him to the FBI.

Osmakac "went to another place" and asked again about "bodies," but he was told that this location could "only get one."

Following these visits with several drug dealers, Osmakac ultimately did not purchase a gun in St. Petersburg. However, his attempt to do so in late November 2011 led the FBI to begin additional, physical surveillance of Osmakac and to direct an undercover FBI agent to start work on an undercover operation.

After Osmakac returned from his St. Petersburg trip, the CS also began recording his conversations with Osmakac. For example, on November 30, 2011, the CS had a conversation with Osmakac at the end of the work day. The CS began by chastising Osmakac for recently attempting to buy guns in St. Petersburg from drug dealers. During the conversation, the CS asked Osmakac whether he was going to go forward with an unspecified "plan" that Osmakac had been preparing. Osmakac responded that "[t]here is no going back, I put the belt on, and there is nobody stopping me." The CS said he would help Osmakac get the materials for this "plan," which involved the use of two suicide belts. Osmakac said that if

7

another "brother" did not join him in the attack, he would use both belts and "put one on [his] leg if [he had] to."

During the period that Osmakac was in contact with the CS, Osmakac believed that the United States was "spying" on him, and Osmakac took measures to avoid government detection. Osmakac told the CS that a "plane kept circling" and following him. Osmakac also told the CS that he walked the beach at night and parked his car far away from the beach "because they have spying equipment in these airplanes." When the CS heard Osmakac's concerns about government surveillance, he told Osmakac that a friend, "Amir," had advice on how to evade detection. The CS stated that Amir sold suicide belts and knew how to "set [them] up." Amir was, in fact, an undercover FBI agent, but Osmakac did not know this. The CS asked Osmakac if he wanted to meet Amir, and Osmakac agreed.

On December 19, 2011, Osmakac spoke with Amir for the first time, over a phone call. Osmakac said that the FBI was monitoring his phone, and, in code, he discussed buying weapons from Amir.

Later that day, Osmakac separately told the CS that he was "changing his plan," and he provided details on what the plan entailed. Osmakac told the CS that his previous target was "too small," so his new plan included attacking a "gay night club" filled with "3 or 4 hundred people." Osmakac said: "[I]t's gonna be, a second 9/11." Osmakac said that he was going to shoot a hostage every 30 minutes

8

until his Muslim "sisters and . . . brother[s]" were released from Guantanamo and elsewhere.

On December 21, 2011, Osmakac met with Amir. Osmakac discussed his planned attack and told Amir that he wanted several types of weapons for it. Osmakac said that he wanted multiple machine guns for the plot: "one AK[-47] at least . . . [m]aybe a couple of Uzi cause they're better to hide." Osmakac also said that he wanted "long magazines" of bullets for the machine guns, "ten grenades, minimum," and a suicide vest. Osmakac stated that he thought he could carry about 25 pounds of explosives and that he wanted a blast that went "all the way" around. Osmakac also said to Amir that he might need refresher training for the AK-47 and that he definitely needed instruction for the other items.

On December 23, 2011, Osmakac met Amir again, and the two further discussed the items that Osmakac wanted for the attack. Osmakac suggested that they go to a warehouse so that Amir could train him without being detected by law enforcement. When Amir asked Osmakac for a down-payment on the items, Osmakac said that he had $500 from his salary and that the CS would pay the balance. As they discussed the cost of the items, Osmakac added a new element to his plan that he had not previously mentioned to Amir. Osmakac asked:

> I know like, Afghanistan they make IEDs for like five dollars. I know over there it's a lot cheaper, but how much will it cost to fill up like two trunks . . . if I could get two three rental cars from somewhere to fill up like two trunks with like explosives . . . .

"Trunks of cars?" Amir asked. "Yeah," Osmakac said, adding that he would also need a remote detonator. Amir asked Osmakac whether this meant that Osmakac was no longer going through with his original plan. Osmakac explained that he intended to carry out the original plan, along with the new car-bomb element. Osmakac said that he had not mentioned the car bombs before because he knew that explosives were difficult to obtain and that brothers "overseas" had been "busted" when they had tried to acquire large quantities of explosives.

Amir said that he might be able to provide explosives for one car bomb but that it would be difficult to get more without drawing unwanted attention. Amir asked whether Osmakac wanted to use the "bomb that [Osmakac was] gonna wear" to "knock down a building" or "just . . . people." Osmakac said that he had not decided yet but that it would be better if buildings collapsed because "it's more terror in their hearts." In response to Amir's questions, Osmakac clarified that he wanted a high-intensity bomb because it would "rip flesh" better. Osmakac and Amir agreed on a price of $2,500 for the guns and explosives.

Osmakac also discussed making a martyrdom video. Osmakac asked Amir if Amir could get a shahada flag (a black flag imprinted with the Arabic testimonial of faith), but Amir said that he could not. Osmakac separately mentioned that he planned to ask the "brother" who had told him about the guns in St. Petersburg to join him in "the big hijrah"—the suicide mission.

10

On December 24, 2011, Osmakac met with the CS at a coffee shop. Osmakac told the CS about the car-bomb element and added new details about Osmakac's plan. Osmakac said that, if four people joined him, he would blow up the four bridges in the Tampa Bay area, which would leave 2 to 3 million people "sitting ducks." Osmakac said: "I'm thinking like put, put some strong stuff in the trunk so the whole bridge will . . . collapse." Once the bridges were down, Osmakac said that the economy would "go down the toilet" and "three, four million people . . . gonna starve."

When the CS replied that Osmakac's plan might hurt a lot of Muslims in the Tampa area, Osmakac told the CS that the Muslims are "gonna' pay the price already for not supporting." Osmakac suggested that he and the CS sell Osmakac's passport to someone who wanted to come to the United States and carry out an attack.

On December 27, 2011, Osmakac told the CS that Osmakac needed to get a different car and "disappear" from law enforcement. The CS suggested that, if Osmakac was not completely ready, he should not move forward with his plan, but Osmakac said that law enforcement agents were "not going to let go of [him]."

On January 1, 2012, Osmakac met with Amir again. Osmakac told Amir that he had an old Honda Accord that he could use for the car bomb. Osmakac also told

11

Amir that, on the night Osmakac chose to attack, he would meet up with Amir at about 7:00 p.m. and then "wait [until] the right timing."

Over the course of the conversation with Amir, Osmakac asked about the range of a cellphone detonator for the car bomb. When Amir explained that it worked like a regular cellphone, Osmakac replied:

> That's good. Cause I want to do something. Something terrifying. Like one day, one night, something going to happen. Then six hours later somewhere else.

Amir responded that Osmakac could still change his mind, but Osmakac replied:

> There's no going back. We all gonna' die, man . . . . So, why not die the Islamic way.

Osmakac told Amir to make sure that he left no evidence on the car bomb in case law enforcement disrupted Osmakac's plan. Amir asked Osmakac why he needed to carry out the car-bomb portion of his plan, and Osmakac explained that he wanted to kill people first and then demand the release of prisoners. Amir said that he would text Osmakac when everything was ready.

On January 7, 2012, Amir sent a text message to Osmakac indicating that he was ready to deliver all of the weapons for Osmakac's planned attack. Osmakac and Amir agreed to meet that night at a hotel for the delivery. When the two met at the hotel that evening, Amir first drove Osmakac around in Amir's car and discussed "the plan for that day."

During this discussion, Osmakac mentioned that he had changed his plan to target a Hard Rock Casino. Osmakac explained that this had become a better target because "[t]here's not as many police." Osmakac also reiterated his concern about being followed. Amir told Osmakac that he would "rather just wait" if Osmakac believed that they were being followed, but Osmakac replied: "No[,] I think we lost them . . . I don't think this opportunity is gonna come much cause we don't lose them many times."

While still in Amir's car, Amir showed the car bomb to Osmakac. The detonator included typewritten instructions taped on the inside lid. Once again, Amir said that Osmakac should not go forward with his attack if he was not mentally prepared. Osmakac told Amir that he felt good and that he planned to go to the Hard Rock Casino after he detonated the car bomb and kidnap "a hundred [people], force them in a big room over there."

Osmakac then said that he planned to listen to one of Shaykh al-Awlaki's lectures, and he began discussing his martyrdom video. Osmakac told Amir that they should turn up the volume of the television in the hotel room when Osmakac made the video (so that no one could hear their voices) and that Osmakac would speak in English, German, and Albanian in the video. Osmakac said that he had the camera with him, and he asked Amir to deliver the video to the CS after the attack.

13

When Osmakac and Amir got to the hotel, Osmakac again mentioned that he wanted to "record the video." The two men went into the hotel room, which was outfitted with a hidden video-recording device. Amir showed Osmakac the weapons he had brought, including the grenades, an ammunition belt and magazines, the AK-47 rifle, and a suicide vest. The weapons were non-functional, but Osmakac did not know this. Amir showed Osmakac how to use the weapons and how to detonate the suicide vest, which was equipped with a flip-switch detonator and was constructed of eight cylindrical tubes containing (inert) explosives that were attached to a wide belt with suspenders. After a few times practicing donning and doffing the gear and reiterating his attack plans, Osmakac asked Amir: "So, wanna make the video, do you wanna do it now?"

After receiving more instruction about the car bomb and suicide vest from Amir, Osmakac selected several items to be displayed in the video. He sat cross-legged on the floor of the hotel room, with a .45 caliber handgun in his right hand, an ammunition belt strapped around his waist, and the AK-47 rifle propped up behind him. Amir held the camera. Osmakac first made a short test video, stating:

> For those of you who know me already from my previous videos, there's no need for me to get into any details. We already know this is part of the good and all I have to say is we will not stop with this. One point five million and more people died even before the war started. We will go after every one of them, their kindergartens, their shopping centers, their night clubs, their police stations, their court houses and everything. Until we have an Islamic state the whole

14

world, that was once Islamic will be the Cilafah [Caliphate] and then until we revenge every Muslim death.

After confirming the quality of the recording, Osmakac then made an eight-minute martyrdom video, speaking in three languages without the use of any notes.[2] Osmakac said that the attack was "payback" for killing Osama Bin Laden. Osmakac also said that he was coming for American blood, that he had led a life of terrorizing non-Muslims, and that other Muslims needed to "wake up."

After Osmakac finished his video, Amir gave Osmakac the key to a get-away rental car. Osmakac drove the rental car to a Starbucks in the Hyde Park area of Tampa, near his planned target. Amir waited at the hotel until Osmakac returned. After a brief discussion inside the hotel room, Osmakac and Amir went outside to transfer the car bomb from Amir's car to Osmakac's own car. Amir gave Osmakac an unloaded pistol and a magazine, and Osmakac loaded it and put it in his car. Amir explained how to arm the car bomb.

Osmakac and Amir got out of Amir's truck and began transferring the bomb to Osmakac's car. The bomb was heavy, so they had to disassemble the major components first. A hidden camera recorded Osmakac lifting components of the bomb out of Amir's truck and putting them into the trunk of Osmakac's car. Amir helped Osmakac hook up the inert explosives to the detonator, and they closed the

---

[2]Osmakac speaks Albanian, German, and English and was also learning Arabic phrases at the time.

trunk. The two men said their goodbyes, and Amir drove away. Osmakac then entered his car and put it into reverse, but before he could leave the hotel parking lot, law enforcement officers arrived and immediately arrested him.

## II.  PROCEDURAL HISTORY

On February 2, 2012, a federal grand jury returned a two-count indictment against Osmakac. The indictment charged Osmakac with committing one count of knowingly attempting to use weapons of mass destruction, specifically, explosives, grenades, and similar devices, in violation of 18 U.S.C. § 2332a(a)(2) (Count 1), and one count of possessing a firearm not registered to him, specifically, an AK-47 machine gun, in violation of 26 U.S.C. §§ 5861(d), 5871 (Count 2). Osmakac entered a plea of not guilty and proceeded to trial.

## A.    Disclosure of Certain FISA Materials

On February 10, 2012, the district court set a trial date for Osmakac of March 5, 2012 and ordered the United States to provide pretrial discovery materials to Osmakac. On February 17, 2012, the United States notified the district court and Osmakac that it intended "to offer into evidence, or otherwise use or disclose . . . information obtained or derived from electronic surveillance or physical search conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 (FISA), as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829."

As part of the pretrial discovery process, the United States provided Osmakac with extensive FISA materials, which included FISA interceptions or evidence. The FISA discovery materials were provided by the government on six separate dates in 2012: February 17, 2012; February 23, 2012; April 24, 2012; August 20, 2012; October 4, 2012; and November 19, 2012. As noted above, the FISA interceptions of Osmakac's conversations began in early December 2010. The government submits that it provided Osmakac with surveillance logs of the physical surveillance during the period prior to November 1, 2010, in which defendant Osmakac was observed.

The United States, however, did not provide Osmakac with all of the FISA materials because some of them contained classified information.

**B.    Osmakac's Motion for Disclosure of Non-Produced FISA Materials**

On March 6, 2013, after the United States's six disclosures, Osmakac filed a motion for "Disclosure of Brady, Giglio, Federal Rule of Criminal Procedure 16 and Jencks Material." Osmakac's motion sought additional disclosure of "all investigative, surveillance and interview material which references [Osmakac]."

In March and May 2013, Osmakac also filed three motions (collectively, "the FISA motions") seeking disclosure of particular FISA materials, including the underlying FISA applications and orders, as well as information related to any

17

FISA event. These three FISA motions are the only disclosure requests at issue on appeal.[3]

The United States opposed Osmakac's motions, filing both unclassified and classified briefs and relevant classified documents. The United States submitted an unclassified "Declaration and Claim of Privilege of the Attorney General of the United States," in which the Attorney General (then Eric Holder) stated that "it would harm the national security of the United States to disclose or hold an adversarial hearing with respect to the FISA Materials" in this case. The Attorney General also explained that the United States would submit to the district court a classified declaration of an FBI official that would detail the specific facts supporting the Attorney General's claim of privilege. Based on the facts set forth in that classified declaration, the Attorney General stated that unauthorized disclosure of the classified FISA materials "could reasonably be expected to cause serious damage to the national security of the United States."

The district court conducted an in camera, ex parte review of the FISA materials. In a thorough order, the district court concluded that the electronic surveillance and physical searches described in the FISA materials were lawfully authorized and lawfully conducted in compliance with FISA and the Fourth

---

[3]These three FISA motions incorporate by reference the facts alleged in Osmakac's March 6, 2013 motion for disclosure of Brady, Giglio, Federal Rule of Criminal Procedure 16, and Jencks material.

Amendment. The district court found that each FISA application contained facts establishing probable cause to believe that: (1) the target of the FISA surveillance or search was an agent of a foreign power; (2) each of the facilities, places, premises or property subject to the FISA surveillance or search was or was about to be owned, used, possessed by, or was in transit to or from, an agent of foreign power; and (3) the property to be searched contained foreign intelligence information. See 50 U.S.C. §§1801(b)(2), 1805(a)(2)(A) and (a)(2)(B), 1823(a)(3)(B), 1824(a)(2)(A), (2)(B), and (4).

In addition, the district court found that each FISA application contained all the required statements and certifications and that no certification for a target who was a United States person was clearly erroneous. The district court found that the FISA materials were well organized and readily understood and that the district court did not require the assistance of Osmakac's counsel to make an accurate determination of the legality of the surveillance and searches. "Thus," the district court concluded, "there is no valid, legal reason for disclosure of any of the FISA materials to Osmakac," and the district court denied Osmakac's FISA motions seeking additional disclosure.

## C.    Closing Arguments at Trial

On May 27, 2014, after the district court had denied Osmakac's FISA motions, the case proceeded to a 10-day trial. On June 9, 2014, during the closing-

19

argument portion of the trial, Osmakac's counsel argued that Osmakac was entrapped by the FBI and that his mental condition rendered him more susceptible to manipulation by government agents and informants. Osmakac's counsel pointed out that, even though Osmakac and the CS began interacting in September 2011, there were no FBI recordings, logs, reports, or testimony about the first two months of interaction between Osmakac and the CS. In fact, the CS only began recording his interactions with Osmakac on November 30, 2011. The closing argument of Osmakac's counsel emphasized that the government had not shown the jury any FBI reports or surveillance logs and that this lack of evidence should cause the jury to doubt "what really happened in this case," stating:

> And when [Amir] was testifying, he told you about Agent Collins who's been sitting here through the whole trial. He told you about other FBI agents. He told you Agent Collins was the case agent. Who wrote the reports that he hasn't seen? Why are they keeping those reports from us? Why wouldn't they show those reports to [Amir] before he testified so that he could answer questions about it? Why don't we have the reports that were written by the FBI in this case? Why don't we have the surveillance logs that were done by the FBI in this case? Why don't we have those things? Why didn't Agent Collins testify? What are they scared of putting Agent Collins on? Why is that?

> How about the other agents they talked about; the surveillance guys who saw this and saw that supposedly? If they saw it, why aren't they here? Does a lack of evidence give you a reasonable doubt about what really happened in this case?

The prosecutor opened her closing rebuttal by saying that there was other evidence entered in the case and that the jury should not ignore that evidence based

20

on speculation about the FBI reports and surveillance logs that were not before the jury for consideration, stating:

> So ladies and gentlemen, essentially what Mr. Tragos [Osmakac's counsel] has just stood up and asked you to do is to ignore every piece of evidence that has been entered in this case, to ignore everything that you can see and hear and judge on its own merits and to throw it out the window in favor of baseless speculation. That's what he's just asked you to do.
>
> You've seen enough during this trial to know that there are rules of evidence, that there are rules about what kinds of evidence can be entered in a case and what can't.
>
> Mr. Tragos asked you to speculate about why reports weren't entered, about why surveillance logs weren't entered, about why certain agents did or did not testify. <u>All of those are things that are, unfortunately, not part of your consideration.</u> The Judge makes those sorts of determinations if evidence is offered.

 (emphasis added).

Osmakac's counsel objected, explaining at sidebar that "it's improper for the prosecutor to tell [the jury] to ignore this. There is no evidence that they cannot consider that there is evidence not there and not presented. It is a fact that lack of evidence can be a reason for reasonable doubt." Osmakac's counsel requested that the district court "instruct the jury that the prosecutor was in error and that they can consider the lack of evidence in their deliberations." The district court instructed that it would discuss this proposal with the parties at the charge conference.

21

At the charge conference, the district court spoke with the parties about the proposed curative instruction. When the district court asked Osmakac's counsel about the instruction, Osmakac's counsel stated:

> Well, first, Your Honor, just for the record, I'd like to move for a mistrial because I do believe that comment severely prejudices the jury in their consideration.

The district court denied the mistrial motion. Following that denial, Osmakac's counsel proposed the following jury instruction as an alternative:

> A reasonable doubt is a doubt based upon reason and common sense and may arise from the careful and impartial consideration of all the evidence or from lack of evidence.

(emphasis added).

The next day, on June 10, 2014, the district court explained to the parties that it had made changes to the jury instructions. The district court pointed out that Instruction 3, which was the parties' original, joint proposed instruction, already stated that "evidence includes the testimony of witnesses and the exhibits admitted, but anything the lawyers say is not evidence and isn't binding on you."

However, the district court added additional language to Instruction 3: "[a] reasonable doubt may arise from the evidence, from a lack of evidence or from a conflict in evidence." (emphasis added). Neither party objected to the revised wording. The district court then read the instructions, including the revised

Instruction 3, to the jury. Following the instructions, the jury found Osmakac guilty on Counts 1 and 2.

## D.    Sentencing Hearing

In advance of sentencing, the federal probation office prepared a presentence investigation report ("PSI"). The PSI calculated Osmakac's total offense level as 45, but that offense level was capped at 43 under the relevant advisory guidelines commentary. Osmakac's total offense level of 43 and criminal history category of VI resulted in an advisory guidelines range of life imprisonment. On appeal, Osmakac does not challenge the advisory guidelines calculations.[4]

On November 5, 2014, the district court held a sentencing hearing. At the hearing, Osmakac's counsel argued for a downward departure of Osmakac's sentence based on "sentencing entrapment" by the United States. Specifically, Osmakac's counsel objected that Osmakac only wanted to procure guns, not weapons of mass destruction, and thus should receive a downward departure.

In response, the United States cited United States v. Sanchez for the proposition that the Eleventh Circuit does not recognize this type of downward departure. 138 F.3d 1410, 1414 (11th Cir. 1998). When the district court asked Osmakac's counsel to address Sanchez, Osmakac's counsel replied: "I recognize that the Eleventh Circuit in the Sanchez case . . . as a matter of law has rejected

---

[4]In the district court, Osmakac's counsel objected to the PSI's base offense level (which Osmkac's counsel calculated to be 28) and to a 12-level terrorism increase under U.S.S.G. § 3A1.4(a). The district court overruled both objections.

23

sentencing entrapment, and it also goes on to speak about sentencing factor manipulation." Osmakac's counsel added: "I recognize that the Eleventh Circuit's opinion right now is that there is no such thing."

The district court asked Osmakac's counsel to clarify this previous statement and say whether or not he meant to preserve an objection based on sentencing entrapment. Osmakac's counsel affirmatively replied that he wished to preserve the sentencing-entrapment objection. The district court then told Osmakac's counsel in response: "[I]f you would like to argue for a change in the law in that regard, you're free to assert that on appeal."

Before concluding, the district court also asked Osmakac's counsel what specific facts he would cite to distinguish Sanchez. Osmakac's counsel answered that Osmakac, on his own, wanted to procure only guns and that only the government introduced the weapons of mass destruction, arguing:

> Well, Your Honor, in this case, our position is that all the Defendant wished to procure on his own were guns, according to the statements that -- on the transcripts, that he went down to St. Petersburg to buy some guns, and that the Government introduced weapons of mass destruction, and therefore, this matter should only be with regards to the count with regards to the unlawful possession of the guns and that the weapons of mass destruction was a sentencing entrapment by the Government in order to increase the Defendant's sentence.

The district court took note of the objection and the proffered factual distinctions.

After considering the advisory guidelines range and the factors set forth in 18 U.S.C. §§ 3551, 3553, the district court sentenced Osmakac, within the guidelines range, to 480 months' imprisonment on Count 1 and 120 months' imprisonment on Count 2, to run concurrently. Osmakac timely appealed.

## III.  FISA MATERIALS

On appeal, Osmakac argues that the district court erred in denying him access to certain FISA materials relating to the government's surveillance and physical searches. In particular, Osmakac wants to obtain the government's FISA applications and supporting documents, as well as the FISA Court orders granting the applications and authorizing the surveillance of Osmakac, a naturalized U.S. citizen. Osmakac wants to review the applications and orders to determine the legal basis for the surveillance and searches and thus determine whether the surveillance and searches were in fact legal. While the government has already disclosed some of the evidence derived from the FISA process, the government has not disclosed all of this FISA-derived evidence and also has not disclosed the FISA applications or the FISA Court orders.

## A.    Standard of Review

This Court reviews for an abuse of discretion a district court's decision not to disclose information obtained pursuant to a FISA surveillance or search. United States v. Badia, 827 F.2d 1458, 1464 (11th Cir. 1987). "[W]hen employing an

abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). As this Court has explained:

> By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."

Id. (quoting Rasbury v. IRS (In re Rasbury), 24 F.3d 159, 168 (11th Cir. 1994)).

## B.    FISA Application Requirements

Because FISA applications, FISA orders, and the disclosure of FISA-derived materials are controlled by FISA's thorough statutory procedures, we outline those procedures in detail.

In 1978, Congress passed FISA to regulate certain government surveillance, conducted within the United States for the purpose of obtaining "foreign intelligence information." 50 U.S.C. § 1801, et seq. Specifically, § 1803 and § 1822 grant the FISA Court the authority "to hear applications for and grant orders" approving surveillance or a physical search under FISA's statutory requirements. 50 U.S.C. §§ 1803(a), 1822(c). FISA provides certain procedures that the government must follow before it can perform surveillance or a search,

thus striking a balance between the need to protect essential national security interests and the need to protect personal privacy and freedom of expression.

To obtain an order under FISA, the government must establish, inter alia, probable cause to believe that the target of the electronic surveillance or physical search is "a foreign power or an agent of a foreign power" and that the facilities or places at which the surveillance or search is directed are being used or are about to be used by the target. 50 U.S.C. §§ 1804(a)(3), 1805(a)(2), 1823(a)(3), 1824(a)(2).[5] Osmakac's motions to discover FISA materials are evaluated using FISA's probable-cause standard, not the probable-cause standard applicable to criminal warrants. See, e.g., United States v. El-Mezain, 664 F.3d 467, 564 (5th Cir. 2011). In reaching the "probable cause" determination, the FISA Court "may consider past activities of the target, as well as facts and circumstances relating to current or future activities of the target." 50 U.S.C. §§ 1805(b), 1824(b).

Specifically, to obtain an order for a FISA surveillance or search, the government must submit to the FISA Court an application, approved by the Attorney General, which includes certifications by a designated official of the executive branch. 50 U.S.C. §§ 1804(a)(6), 1823(a)(6). The certifications must show: (1) that the information sought is foreign-intelligence information, 50 U.S.C.

---

[5]Physical search applications are similar but distinct from the applications for electronic surveillance. Compare 50 U.S.C. § 1804(a) with id. § 1823(a).

27

§§ 1804(a)(6)(A), 1823(a)(6)(A); (2) that "a significant purpose" of the searches and surveillance is "to obtain foreign intelligence information," 50 U.S.C. §§ 1804(a)(6)(B), 1823(a)(6)(B); and (3) that the information sought "cannot reasonably be obtained by normal investigative techniques," 50 U.S.C. §§ 1804(a)(6)(C), 1823(a)(6)(C). The certifications must further: (4) designate the "type of foreign intelligence information being sought," 50 U.S.C. §§ 1804(a)(6)(D), 1823(a)(6)(D); and (5) include a statement that describes why the information is so designated and why it cannot be reasonably obtained by normal investigative techniques, 50 U.S.C. §§ 1804(a)(6)(E), 1823(a)(6)(E).

In addition to including these certifications, a FISA application must also identify proposed "minimization procedures" that the government will employ that are reasonably designed to minimize the acquisition and retention, and prohibit the dissemination, of non-publicly available information concerning any "unconsenting United States persons" consistent with the government's need to obtain, produce, and disseminate foreign-intelligence information. 50 U.S.C. §§ 1801(h), 1804(a)(4), 1805(a)(3), 1821(4), 1823(a)(4), 1824(a)(3).

If a reviewing FISA Court judge is satisfied that a FISA application has met the statutory requirements and makes the necessary findings, the FISA Court judge may issue an order authorizing the surveillance or search. 50 U.S.C. §§ 1805(a), 1824(a).

28

## C.    Court Review of FISA Application

The FISA applications approved by the Attorney General, as well as the required executive branch certifications contained therein, are subject only to "minimal scrutiny." United States v. Campa, 529 F.3d 980, 993 (11th Cir. 2008) (citation omitted) (stating "[w]hen, as here, the applications contain the required certifications, they are subject 'only to minimal scrutiny by the courts'"); Badia, 827 F.2d at 1463 (stating "[o]nce the certification is made, it is subjected only to minimal scrutiny by the courts"); see also United States v. Stewart, 590 F.3d 93, 127 (2d Cir. 2009) (citation omitted) (stating "[w]hen the application is complete and properly certified by an executive branch official, however, it is, under FISA, subjected to only minimal scrutiny by the courts"). "The reviewing court has no greater authority to review the certifications of the executive branch than the FISA court has." Campa, 529 F.3d at 993. When no "United States person" is a target of the search or surveillance, "in the absence of a prima facie showing of a fraudulent statement by the certifying officer, procedural regularity is the only determination to be made." Id.[6]

---

[6]Section 1801(i) of FISA defines a "United States person" as "a citizen of the United States, an alien lawfully admitted for permanent residence . . ., an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power." 50 U.S.C. § 1801(i).

If, as here, the FISA target is a United States person, we review to ensure only that the certifications in the application are not clearly erroneous. Id. at 994. In making our review of the certifications, we may consider the statement in the application that formed the basis for the certifications and any other information furnished in connection with the application. Id. (citing 50 U.S.C. § 1824(a)(5) (2008)).

## D.     Federal Court Disclosure of FISA Information in Criminal Proceedings

FISA imposes strict limitations on when information obtained pursuant to a FISA surveillance or search order may be used or disclosed. See 50 U.S.C. §§ 1806, 1825. Regarding criminal proceedings, the government must notify the district court and the "aggrieved person," the defendant Osmakac here, that it intends to use or disclose FISA-derived evidence:

> Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial . . . against an aggrieved person[] any information obtained or derived from an electronic surveillance [or search] of that aggrieved person[,] . . . the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information.

50 U.S.C. §§ 1806(c), 1825(d). The "aggrieved person" against whom the government intends to introduce FISA evidence "may move to suppress the evidence obtained or derived from such electronic surveillance [or physical search]

30

on the grounds that-- (1) the information was unlawfully acquired; or (2) the surveillance [or physical search] was not made in conformity with an order of authorization or approval." 50 U.S.C. §§ 1806(e), 1825(f).

If, as in this case, the district court receives notice that the government intends to introduce FISA evidence, and the Attorney General files an affidavit under oath stating that "disclosure or an adversary hearing would harm the national security of the United States," the district court must review "in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the [surveillance or search] of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. §§ 1806(f), 1825(g). The district court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the [surveillance or search] only where such disclosure is necessary to make an accurate determination of the legality of the [surveillance or search]." 50 U.S.C. §§ 1806(f), 1825(g) (emphasis added); United States v. Abu-Jihaad, 630 F.3d 102, 129 (2d Cir. 2010) (holding that there was "no denial of due process in the district court's decision not to order disclosure of FISA materials to the defendant" because disclosure of the FISA materials was not necessary "to assess the legality of the challenged surveillance").

## E.    Osmakac's FISA Challenge

Osmakac concedes that the district court's order, denying the disclosure of the requested FISA materials to Osmakac, "clearly outlines the steps undertaken by the District Court in making its determination of whether or not to grant the Appellant's FISA motions." Osmakac acknowledges that "the District Court's enumerated steps appear to be in compliance with existing case law as to the procedure followed in arriving at the decision made by the District Court." Nevertheless, Osmakac argues that the certifications which the district court reviewed in camera and ex parte cannot support the district court's conclusion that the surveillance was legal, even under minimum scrutiny. See Badia, 827 F.2d at 1463.[7]

Because Osmakac's counsel has not seen the undisclosed FISA material, Osmakac's counsel's arguments are made generally and not in specific detail. Out of an abundance of caution, and given the difficulty facing Osmakac's counsel in articulating specifics, this panel has independently and thoroughly reviewed the FISA materials not disclosed to Osmakac. We have reviewed in camera and ex

---

[7]Osmakac does not challenge the FISA statutory scheme per se but rather argues that the district court failed to properly apply FISA's disclosure requirements in this instance as to him. Further, while Osmakac's brief argues primarily about the sufficiency of the certifications, Osmakac still seeks in this appeal access to not only the certifications but also the FISA applications, the FISA orders, and all supporting documents. He contends on appeal that the district court erred not just in denying him access to the certifications but also access to the other FISA materials, including the FISA applications and orders.

32

parte the FISA applications, the FISA Court orders, and the parts of the FISA-derived evidence not disclosed to Osmakac or his counsel.

After that careful and thorough review, we readily find that all of the FISA statutory requirements are satisfied, that the FISA-derived evidence in this case was legally acquired, and that the FISA surveillance and searches were made in conformity with the FISA Court's order of authorization and approval. The FISA materials are very clear and well-organized, and disclosing them to Osmakac is not "necessary" to assess the legality of the searches or surveillance. See 50 U.S.C. §§ 1806(f), (g), 1825(g), (h). The district court conducted a detailed, thorough review of the same materials, explained why the United States successfully met each of the numerous FISA application requirements, and also explained why any further disclosure of the FISA materials to Osmakac was not appropriate in this case. After our review, we conclude that the district court did not abuse its discretion in denying Osmakac's motions seeking disclosure of the FISA applications, the FISA Court orders, or any remaining FISA-derived evidence.

## F.    Osmakac's Confrontation Clause Challenge

We recognize that Osmakac also raises a constitutional challenge to the district court's denial of access to the FISA materials. Specifically, Osmakac argues that his Sixth Amendment right to confrontation (as found in the Confrontation Clause) was "abrogated" without access to all of the FISA materials.

Osmakac did not raise this constitutional challenge before the district court. However, the district court sua sponte addressed the Confrontation Clause issue in its order denying the disclosure of the additional FISA materials to Osmakac. In the order, the district court stated that "the Sixth Amendment's right to confrontation is not a basis for granting access to the FISA materials at issue. The right to confrontation is 'not absolute' and may bow to accommodate legitimate interests in the criminal trial process without violating the defendant's Sixth Amendment rights."

Osmakac's appellate brief devotes only a single sentence to the Confrontation Clause challenge, and it fails to cite additional supporting legal authority. Ample circuit precedent supports the conclusion that Osmakac has thus waived his Confrontation Clause challenge. See Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1283 (11th Cir. 2009) ("Because [the plaintiff] has failed to develop the argument or to offer any citation to the record in support of it, we deem the argument waived.").

However, given the 480-month sentence Osmakac is serving and the seriousness of his crimes, we exercise our discretion to reach Osmakac's Confrontation Clause challenge. As an alternative and independent ground, we also conclude that, even if not waived, Osmakac's constitutional challenge wholly lacks merit.

34

The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This right "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." Coy v. Iowa, 487 U.S. 1012, 1017, 108 S. Ct. 2798, 2801 (1988) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 999 (1987) (plurality opinion)). However, while "[t]he Confrontation Clause protects a defendant's trial right to confront testimony offered against him to establish his guilt, [it] has never extended . . . beyond the confines of a trial." United States v. Campbell, 743 F.3d 802, 808 (11th Cir. 2014). This alone defeats any argument by Osmakac that the Confrontation Clause entitles him to pretrial discovery of the FISA materials on grounds apart from confronting and cross-examining the witnesses against him at trial.

At most, this leaves Osmakac with only a claim that his right to cross-examine witnesses at trial was undermined because he did not have access to the FISA materials. "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose the[] infirmities [of a witness] through cross-examination." Delaware v. Fensterer, 474 U.S. 15, 22, 106 S. Ct. 292, 295 (1985) (per curiam). The ability to cross-examine witnesses

35

does not include the power to require the pretrial disclosure of all information that might be potentially useful in contradicting unfavorable testimony.

Here, Osmakac's confrontation rights were satisfied because he was given wide latitude at trial to confront and cross-examine each of the witnesses testifying against him. Indeed, Osmakac faced and cross-examined multiple witnesses at trial, and he makes no showing that his ability to do so was hampered in any way.

The Confrontation Clause guarantees "an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." <u>Id.</u> at 20, 106 S. Ct. at 294. Osmakac's <u>confrontation</u> rights were not violated here simply because he could not search through all of the FISA material at issue looking for potentially favorable evidence. The Sixth Amendment's right to confrontation is a right to certain constitutionally guaranteed trial procedures, not a basis for granting pretrial discovery of, or subsequent access to, the FISA materials at issue. <u>United States v. Isa</u>, 923 F.2d 1300, 1306-07 (8th Cir. 1991). The district court accordingly did not abuse its discretion in denying Osmakac's motion seeking disclosure of the FISA materials at issue in this appeal.

## IV.  PROSECUTORIAL MISCONDUCT

We next address Osmakac's claim that the prosecutor's misstatement—that the jury should not consider a lack of certain evidence (such as the FBI reports and

36

surveillance logs) when determining guilt or innocence—so prejudiced Osmakac as to deny his constitutional right to due process. Osmakac argues that the district court's curative instruction was insufficient to cure this error and that the district court should have declared a mistrial.

## A.   Standard of Review

This Court reviews <u>de novo</u> a claim of prosecutorial misconduct during closing arguments. <u>United States v. Eckhardt</u>, 466 F.3d 938, 947 (11th Cir. 2006). We review for abuse of discretion a district court's denial of a motion for mistrial. <u>United States v. Sweat</u>, 555 F.3d 1364, 1367 (11th Cir. 2009) (per curiam).

## B.   Legal Principles

To establish prosecutorial misconduct, a two-element test must be met: "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." <u>United States v. Gonzalez</u>, 122 F.3d 1383, 1389 (11th Cir. 1997) (quoting <u>United States v. Eyster</u>, 948 F.2d 1196, 1206 (11th Cir. 1991)). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different." <u>United States v. Hall</u>, 47 F.3d 1091, 1098 (11th Cir. 1995) (citing <u>Kennedy v. Dugger</u>, 933 F.2d 905, 914 (11th Cir. 1991)).

"This Court looks to four factors in deciding whether prosecutorial misconduct has occurred: (1) the degree to which the challenged remarks have a

tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused." United States v. Feliciano, 761 F.3d 1202, 1211 (11th Cir. 2014) (internal quotation marks omitted).

A court makes this determination in the "context of the entire trial and in light of any curative instruction." United States v. Chirinos, 112 F.3d 1089, 1098 (11th Cir. 1997) (quoting United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996)). We will reverse a defendant's conviction for prosecutorial misconduct only if, in this context, "the misconduct may have prejudiced the substantial rights of the accused." United States v. Abraham, 386 F.3d 1033, 1036 (11th Cir. 2004) (per curiam) (quoting United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997)).

## C.    Isolated Statement and Curative Instruction

During the closing argument, the prosecutor incorrectly told the jury that it should not consider a lack of certain evidence. This created no reversible error, however, for several reasons.

First, the district court mitigated any risk of prejudice by providing a curative instruction. The district court expressly instructed the jury that a reasonable doubt may arise from a lack of evidence, stating:

> A "reasonable doubt" is a real doubt, based upon your reason and common sense after you've carefully and impartially considered

38

all the evidence in the case. Reasonable doubt may arise from the evidence, <u>from a lack of evidence</u>, or from a conflict in the evidence.

(emphasis added). The district court thus told the jury that, in spite of what the prosecutor said, it could consider this "lack of evidence" in deciding whether it had a reasonable doubt. The district court added the "lack of evidence" language after a specific discussion with Osmakac's counsel on the issue, and neither party objected to this final instruction. As this Court has often explained:

> Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered. If the district court takes a curative measure, we will reverse only if the evidence is so prejudicial as to be incurable by that measure. We presume that the jury followed the district court's curative instructions.

<u>United States v. Lopez</u>, 590 F.3d 1238, 1256 (11th Cir. 2009) (citations and internal quotation marks omitted). The district court's instructions in this case mitigated any risk that the prosecutor's fleeting misstatement would confuse the jury.

Second, the government's misstatement was both "isolated" and likely accidental. We recognize Osmakac argues that, since he raised a serious entrapment issue, the strength-of-the-evidence factor weighs in favor of a finding of prejudice. But the government's thorough detailing of the evidence shows that there was substantial evidence of Osmakac's guilt, including substantial evidence of his propensity to commit a crime of this nature well before he met the CS in

39

September 2011. Osmakac provides nothing to contradict the trial record, which showed that <u>he</u>, not the undercover agent, initiated and greatly escalated the planned terrorist attack by asking for weapons of mass destruction.

Considering the fleeting and inadvertent nature of the misstatement, the immediate objection by Osmakac's counsel, and the curative instruction by the district court, it is clear that Osmakac's substantial rights were not affected and that he did not suffer prejudice from the prosecutor's misstatement. "Given the considerable weight we afford to a trial court's assessment of the effect of a prejudicial closing remark," <u>United States v. Thomas</u>, 62 F.3d 1332, 1343 (11th Cir. 1995), it also follows that the district court did not abuse its discretion in denying Osmakac's motion for a mistrial on the basis of the misstatement.

## V.  SENTENCING FACTOR MANIPULATION

In the district court, Osmakac argued that the government engaged in sentencing <u>entrapment</u>. On appeal, Osmakac now argues that the government engaged in sentencing factor <u>manipulation</u> of Osmakac's weapons-of-mass-destruction charge by introducing machine guns and explosives to Osmakac. Osmakac asks that his sentence on Count 1 be vacated and remanded for further clarification and consideration in order to allow the district court to consider in the first instance whether to grant a departure based on sentencing factor manipulation.

40

## A.    Standard of Review

When a party raises an issue for the first time on appeal, as Osmakac does here, we review for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). To show plain error, the defendant must show: (1) an error; (2) that is plain; and (3) that affected his substantial rights. United States v. Turner, 474 F.3d 1265, 1275-76 (11th Cir. 2007). If the defendant satisfies the three conditions, we may exercise our discretion to recognize the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 1276. There can be no plain error where there is no precedent from the Supreme Court or us directly resolving the issue. United States v. Charles, 722 F.3d 1319, 1331 (11th Cir. 2013).

## B.    General Principles

Sentencing factor manipulation occurs when the government manipulates a sting operation to increase a defendant's potential sentence. United States v. Haile, 685 F.3d 1211, 1223 (11th Cir. 2012) (per curiam). "Sentencing factor manipulation" involves "the opportunities that the sentencing guidelines pose for prosecutors to gerrymander the district court's sentencing options and thus, defendant's sentences." Sanchez, 138 F.3d at 1414 (quotation omitted). "While sentencing entrapment focuses on the defendant's predisposition, sentencing factor manipulation focuses on the government's conduct." Id.

41

A sentencing factor manipulation claim requires us to consider whether the manipulation inherent in the sting operation, even if insufficiently oppressive to support an entrapment defense or due process claim, warrants a sentencing reduction. Haile, 685 F.3d at 1223. A reduction to a defendant's sentence is only warranted, however, if the sting operation involved "extraordinary misconduct." United States v. Ciszkowski, 492 F.3d 1264, 1271 (11th Cir. 2007). The party raising the defense of sentencing factor manipulation bears the "burden of establishing that the government's conduct is sufficiently reprehensible." Id.

Although this Court has recognized sentencing factor manipulation as a potential means for a sentence reduction, we have never applied it. See id. at 1267, 1271 (government's provision of a firearm equipped with a silencer was not sentencing factor manipulation, even though the possession of the silenced firearm triggered a mandatory 30-year minimum sentence); see also Haile, 685 F.3d at 1223 (government's initiation of a conversation about guns was not manipulation, when it was defendants who agreed to supply the guns, brought the guns to the transaction, and did not reject the offer or express any discomfort with the idea); United States v. Bohannon, 476 F.3d 1246, 1252 (11th Cir. 2007) (government's selection of age of "minor" victim for sting operation was not manipulation even though the selected age resulted in enhancement under the sentencing guidelines).

**C.    Osmakac Introduced Weapons of Mass Destruction**

Here, the evidence does not support Osmakac's allegation that the government introduced the subject of weapons of mass destruction to Osmakac. Rather, the evidence shows that Osmakac on his own added this element to his plot. For example, in the first recorded conversation between Osmakac and the CS, Osmakac initiated the discussion about putting the "belt" on, a reference to a suicide belt. And when Osmakac first spoke with Amir, Osmakac alone introduced the idea of his using a car bomb. In fact, Osmakac's request for such a car bomb was so novel that Amir had to ask clarifying questions about what Osmakac wanted, since prior discussions did not include this car-bomb element. In cases involving similar circumstances, we have declined to find sentencing factor manipulation. See Haile, 685 F.3d at 1223; Ciszkowski, 492 F.3d at 1267, 1271; Bohannon, 476 F.3d at 1252; Sanchez, 138 F.3d at 1414. In each of these cases, it was the defendants, like Osmakac, who took steps to engage in the transaction and did not reject the offer or express any discomfort with the idea. Indeed, Osmakac had multiple chances to say no the transactions, but he never did, even after multiple warnings. Both the CS and Amir warned Osmakac of the ramifications of an attack involving weapons of mass destruction, and they repeatedly told Osmakac not to move forward with his plan if he was not prepared.

In any event, there can be no plain error where there is no precedent from the Supreme Court or this Court indicating that the government's conduct here constituted "extraordinary misconduct" amounting to sentencing factor manipulation. See Charles, 722 F.3d at 1331; see also Ciszkowski, 492 F.3d at 1271.

## VI.  CONCLUSION

For all of these reasons, we affirm Osmakac's convictions and 480 months' sentence.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring in the judgment:

I agree with the majority's conclusion that Sami Osmakac's convictions and sentence are due to be affirmed because he has shown no reversible error. I also agree that the District Court did not abuse its discretion in denying Mr. Osmakac's requests for disclosure of the FISA materials.

With regard to Mr. Osmakac's challenge to the certifications made in support of the FISA applications, the majority's statement of the standard we use to review FISA applications exceeds the facts that confront us here. While Mr. Osmakac seeks access to a full array of FISA documents, his challenge is to the certifications. As to those certifications, the majority opinion accurately states that we subject them to only minimal scrutiny.

Finally, Mr. Osmakac abandoned his Confrontation Clause argument, Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009) (per curiam), so I would not have reached it.

45