[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-10338
Non-Argument Calendar

————————————————

D.C. Docket No. 0:16-cr-60323-KAM-1


UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ADRIAN APODACA,

Defendant–Appellant.


————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(April 30, 2019)

Before WILLIAM PRYOR, GRANT, and HULL, Circuit Judges.

PER CURIAM:

A federal jury found Adrian Apodaca guilty of two counts of attempted possession with intent to distribute cocaine, use of interstate commerce facilities in the commission of murder for hire, Hobbs Act robbery, possession of a firearm in furtherance of a crime of violence or drug trafficking, and possession of ammunition by a convicted person.  The jury also found that the firearm that Apodaca possessed in furtherance of his crimes was equipped with a silencer, triggering a mandatory minimum 30-year sentence of imprisonment under 18 U.S.C. § 924(c)(1)(B)(ii).  The district court sentenced Apodaca to the mandatory minimum of 10 years' imprisonment on the drug trafficking crimes plus 30 years for the firearm offense.

On appeal, Apodaca argues that the government's conduct during the sting operation that caught him was so outrageous that it violated his due process rights, and that several of the charges should have been dismissed as a result.  In the alternative, he argues that the government improperly orchestrated the sting operation to inflate his sentence, and that his sentence should be reduced proportionally.  We disagree and affirm.

## I.

The charges against Apodaca arose from an undercover investigation in which several FBI agents pretended to be members of a crime syndicate involved in cocaine trafficking in Miami.  Apodaca became involved with the organization

2

through his acquaintance with Steven Watt, a fellow white supremacist who was also a government informant.  After observing Watt apparently receive cash payment from agents posing as members of the criminal organization, Apodaca asked Watt for an introduction so that he too could earn some money.  Watt introduced Apodaca to FBI agents posing as leaders of the organization, and Apodaca enthusiastically agreed to work for them.  Apodaca told Watt and the agents that he had been involved in several murders and other violent crimes, including drug-related robberies and criminal debt collection, and the agents designed a sting operation to capitalize on Apodaca's apparent willingness to engage in crimes involving drugs and violence.

As part of the operation, the agents paid Apodaca to act as "security" at a meeting between an agent posing as a member of the organization and another agent, Deon, who acted the part of a drug dealer from Atlanta who owed the organization money.  Apodaca offered to "beat the f*ck out of" Deon and volunteered that he had access to a backhoe if one was needed.  After seeing Deon's expensive sports car, Apodaca suggested that they could recover the organization's money by raiding Deon's house and forcing him to sign over the title to his car.

Later, when one of the agents mentioned that Deon still owed the organization money, Apodaca said, "He's gotta go," which the agent understood to

3

mean that they needed to kill him.  The agent agreed and offered Apodaca $5000 and false identification to kill Deon but told him that it was "up to [him]" whether he wanted to take the job.  Apodaca agreed to the murder-for-hire and thanked the agent "for the opportunity."  He eventually provided a list of supplies that he would need for the murder, which included a gun with a silencer, ammunition, body armor, pepper spray and a gas mask, a phone with "the number for extraction," and information about Deon's movements and the layout of his house.

On the arranged date, an agent picked Apodaca up and drove him from Miami to Valdosta.  Before leaving Florida, the agent gave Apodaca cash, body armor, zip ties, duct tape, rubber gloves, a gas mask, and ammunition, and told him that an associate in Valdosta would have the firearm and silencer that Apodaca had requested.  He offered Apodaca another chance to back out, saying, "I wanna just check and sure [sic] it's cool with you, 'cause if it ain't cool with you, you know, I get it.  I don't want you to do anything you don't f*ckin' wanna do."  Apodaca did not back out; instead, he discussed his plan for the murder, telling the agent why he had asked for pepper spray and a particular type of ammunition and asking if the agent could also get him a "brass catcher" (to collect the shells that would be ejected when the gun was fired) and a change of clothing for after the murder.

During the drive to Valdosta, the agent told Apodaca that he expected Deon to have 5–10 kilograms of cocaine.  He asked Apodaca to find the cocaine and take

4

it from Deon, in exchange for a share of the profits from the sale of the drugs. Apodaca agreed.  When the two arrived in Valdosta, they met another agent who gave Apodaca a gun with a silencer, and an FBI "takedown team" then moved in and arrested him.

Apodaca was charged with attempted distribution and possession with intent to distribute a controlled substance, 21 U.S.C. § 846 (count 1); use of interstate commerce facilities in the commission of murder for hire, 18 U.S.C. § 1958 (count 2); attempted possession with intent to distribute a controlled substance, 21 U.S.C. § 846 (count 3); Hobbs Act robbery, 18 U.S.C. § 1951(a) (count 4); possession of a firearm equipped with a silencer in furtherance of a crime of violence or drug trafficking crime, 18 U.S.C. § 924(c)(1)(A) & (c)(1)(B)(ii) (count 5); and possession of ammunition by a convicted felon, 18 U.S.C. § 922(g)(1) (count 6). He testified at trial, claiming that he had not really intended to go through with the murder, and that the FBI had entrapped him into committing the crimes charged. A jury convicted him of all counts.

## II.

Apodaca's due process and sentencing factor manipulation claims are related arguments bearing some similarity to the defense of entrapment.  In both claims, he argues that the government engaged in misconduct by setting him up to commit crimes that he would not or could not have committed on his own.

5

A.

Ordinarily, this Court reviews claims of constitutional error, including claims that the government engaged in outrageous conduct that violated the defendant's Fifth Amendment rights, *de novo*. *United States v. Augustin*, 661 F.3d 1105, 1122 (11th Cir. 2011). But because Apodaca did not make the "outrageous government conduct" argument in the district court—instead, he argued that the district court should dismiss all charges based on his entrapment defense (which the jury rejected) and for lack of jurisdiction because the government had manufactured the interstate-commerce connection—this Court reviews the claim only for plain error. *Id.*; *see United States v. Moriarty*, 429 F.3d 1012, 1018 (11th Cir. 2005). "Plain error occurs 'if (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Longoria*, 874 F.3d 1278, 1281 (11th Cir. 2017) (citation and some punctuation omitted). Where there is no precedent from this Court or the Supreme Court directly addressing the issue, there is no plain error. *United States v. Osmakac*, 868 F.3d 937, 959 (11th Cir. 2017). "In reviewing charges that official conduct rose to a constitutionally impermissible level, the cases turn on the totality of the circumstances without any single controlling factor." *Augustin*, 661 F.3d at 1122 (citation and punctuation omitted).

6

In *United States v. Russell*, 411 U.S. 423 (1973), the U.S. Supreme Court recognized that law enforcement conduct could conceivably be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction" if it violated "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment."  411 U.S. at 431–432 (citation omitted).  The remedy for outrageous government conduct amounting to a constitutional violation is reversal of the conviction that was secured through the misconduct.  *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007).

To reach the level of a constitutional violation, however, the government's conduct must be truly shocking, "so outrageous that it is fundamentally unfair." *Id.*  A due process violation of this type would occur only in "'the rarest and most outrageous circumstances.'"  *Augustin*, 661 F.3d at 1122 (citation omitted).  Where government agents merely supply contraband or "provide other essential services" to someone who is a willing participant in a criminal scheme, there is no constitutional violation.  *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998); *see also Hampton v. United States*, 425 U.S. 484, 495 n.7 (1976) (Powell, J., concurring) ("[T]he cases, if any, in which proof of predisposition is not dispositive will be rare.").

7

Here, Apodaca showed that he was predisposed to commit violent crimes by bragging about past violence and offering to commit additional violence to further the interests of what he thought was a criminal organization. He proposed and willingly participated in the plan to kill Deon, despite being given multiple opportunities to back out. He specifically requested the gun, silencer, and ammunition that the agents provided for the proposed murder, and although an agent drove Apodaca to Georgia in part to satisfy the interstate travel element of the federal crimes, Apodaca was again a willing participant, having offered to travel to wherever Deon might be to kill him. The government's conduct in creating a scenario calculated to appeal to Apodaca's violent criminal tendencies is exactly what one might expect in a sting operation; it was not "shocking to the universal sense of justice" and did not violate Apodaca's due process rights. There was no error, let alone plain error, in the district court's failure to dismiss the indictment on its own initiative on due-process grounds.

B.

Apodaca also argues that the district court erred in failing to explicitly address his sentencing manipulation argument and "specifically say that it believed it had the power to go below the minimum mandatory because of the manipulation of the sentence." Appellant's Brief at 50. "[S]entencing factor manipulation occurs when the government's manipulation of a sting operation, even if

8

insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus." *Ciszkowski*, 492 F.3d at 1270. Such misconduct may be remedied by reducing the defendant's sentence to remove any sentencing enhancement that resulted from the improper manipulation. *Id.* This includes any related mandatory minimum sentence because "[w]hen a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise in the first place." *Id.* "A reduction to a defendant's sentence is only warranted, however, if the sting operation involved 'extraordinary misconduct.'" *Osmakac*, 868 F.3d at 959 (citation omitted).

Generally, this Court reviews a district court's ruling on a motion for sentence reduction based on sentencing factor manipulation for an abuse of discretion, as part of the Court's review of the sentence for reasonableness. *See Ciszkowski*, 492 F.3d at 1269–70; *United States v. Haile*, 685 F.3d 1211, 1222–23 (11th Cir. 2012). But we will not consider a defendant's argument that the district court erred in imposing a sentence where, as here, the defendant requested or invited the sentence he received. *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006). Although Apodaca argued that his sentence should be reduced based on sentencing factor manipulation, he never asked the court to sentence him below the mandatory minimum. Instead, he asked the court to vary below the Sentencing

Guidelines range of 528–570 months to 480 months, which was the mandatory minimum on all counts (120 months on counts 1–4 plus 360 months on count 5). Dist. Ct. Dkt. 76 at 20 ("So I'm going to ask the Court to grant a downward variance to the 120 months, plus the 360."). The district court gave him what he asked for.

Even if we were to consider Apodaca's sentencing factor manipulation claim, it would fail for the same reasons as his constitutional claim. The federal agents tailored their sting operation to take advantage of Apodaca's obvious willingness to commit violent crimes for money. Providing the means and opportunity for "a willing and predisposed offender" to commit crimes is not the kind of egregious misconduct that would warrant a sentence reduction. *Ciszkowski*, 492 F.3d at 1271. On these facts, it was not misconduct at all.

**AFFIRMED.**

10