[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11812
_____

D.C. Docket No. 1:17-cr-20338-MGC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAIKEL VIGIL GALLARDO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 9, 2020)

Before WILLIAM PRYOR, Chief Judge, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Maikel Gallardo appeals his conviction and sentence of

120 months' imprisonment for conspiracy to possess with intent to distribute five

kilograms or more of cocaine, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846.

Gallardo argues that the district court erred in denying (1) his motion for a mistrial

based on a government witness's false rebuttal testimony and (2) his motion for a

new trial based on the fact that the jury verdict—that he conspired to possess with

intent to distribute five kilograms or more of cocaine—was against the weight of

the evidence given that he was apprehended with only one kilogram of cocaine.

For the first time on appeal, Gallardo argues that he is entitled to a new trial:

(1) because the government failed to disclose timely damaging evidence about the

informant's credibility, in violation of the <u>Brady</u>–<u>Giglio</u>[1] rules; and (2) due to the

government's impermissible sentencing entrapment and sentencing factor

manipulation.  As to his sentence, Gallardo asserts that the district court erred in

using five kilograms of cocaine to calculate his base offense level.  After review,

and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

The trial evidence established the following events and drug deal.

## A.    Initial Investigation

On April 17, 2017, Police Officer David Quintas of the Miami-Dade Police

Department ("Miami PD") and FBI Special Agent Steven Catherman began

---

[1]See <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963); <u>Giglio v. United States</u>, 405 U.S. 150, 92 S. Ct. 763 (1972).

investigating Gallardo when a confidential source ("CS") informed that Gallardo had offered to introduce him to high-level drug suppliers in South Florida.[2] The CS made controlled phone calls to Gallardo to plan to meet in person and arrange for the purchase of multiple kilograms of cocaine. Thereafter, the Miami PD and the FBI surveilled Gallardo when he called and as he met with the CS and Gallardo's drug supplier, later identified as Manuel Angel Arencibia. The phone calls were audio recorded; the meetings were audio and video recorded by the CS and surveilled by law enforcement.[3]

## B.    April 2017 Drug Deal Negotiations

On April 18, 2017, Gallardo and the CS met at a restaurant in Hialeah, Florida. At the meeting, Gallardo revealed that he had drug suppliers from Jacksonville, Tampa, and Colorado. Gallardo explained to the CS: (1) how things work with drug suppliers in Florida; (2) that they were cautious with unknown buyers to avoid being ripped off; and (3) that his Tampa supplier "got scared" when he stated the CS was looking to purchase five kilograms of cocaine. The CS thus would need to start off by buying one kilogram of cocaine and gaining the suppliers' trust, and then he could "come for 20-30 [or] 50" kilograms and could

---

[2]The CS was known to Gallardo as "Rogelio" or "Raul" Perez.

[3]The government introduced the video and audio recordings as well as English transcripts of the recordings, as most of the conversations were in Spanish. The recordings and transcripts were entered into evidence without objection.

3

"be buying a ton." So Gallardo encouraged the CS "to start like that." Although Gallardo had located a supplier who was willing to provide five kilograms of cocaine for $20,000-$25,000, the deal fell through.

The CS pushed for a five-kilogram deal. Gallardo rejected the idea, saying "you're crazy buddy." When the CS indicated that Gallardo's warnings about drug suppliers made him nervous and uncomfortable, Gallardo assured him that he and his suppliers were safe and that he would protect the CS and the deal.

Gallardo said he would introduce the CS to his "high level" cocaine "source" from Jacksonville to smooth things over, establish trust, and make sure the deal was safe. Gallardo revealed that his Jacksonville cocaine source was experienced, knew a lot of people, and had a connection that could give the CS three kilograms immediately. Gallardo insisted, however, that the CS needed to start off small and work his way up.

They continued to discuss Gallardo's suppliers, drug quantities, drug prices, drug-trafficking routes, trust, and the CS's ability to buy larger quantities from Gallardo's suppliers in the future. Meanwhile, Gallardo got a bottle of rum to share with the CS, and they were "very friendly." Gallardo called various sources and confirmed with the CS that his Jacksonville source—who ended up being Arencibia—would come the next day. When the CS tried to clarify how many kilograms the deal would be for, Gallardo said "I don't know, . . . whatever you

4

want." After further discussion, Gallardo and the CS left the restaurant. At this point, FBI Special Agent Juan Valenzuela joined the team surveilling Gallardo and Arencibia.

On April 19, 2017, Gallardo and the CS met at a hotel in Doral, Florida. They initially discussed logistics for the deal with Arencibia, drug prices and quantities, Gallardo's other drug suppliers (in Orlando, Florida, and Texas), and trust. When the CS appeared to be nervous, Gallardo explained that the CS and Arencibia were suspicious of each other since they had not met before and assured that no one would hurt the CS.

Gallardo called Arencibia, who was on his way from Jacksonville. Gallardo confirmed that Arencibia knew the CS needed five kilograms of cocaine, had that quantity, and appeared to indicate he would bring that amount. Gallardo told the CS, however, that Miami buyers only buy a maximum of one kilogram at a time and that they did not want to do a five-kilogram deal with the CS yet. Gallardo reminded the CS that the CS failed to pick up the drugs that Gallardo had arranged for him on a previous occasion because the CS was "f**king around." Gallardo implored that he "need[ed] this [deal] to happen." Because it would be a while before Arencibia arrived, Gallardo and the CS agreed to meet up later.

Later that day, Gallardo, the CS, and Arencibia met in the parking lot of the hotel and got into Gallardo's car. Arencibia asked the CS how much cocaine he

5

was looking to buy, and the CS responded that it depended on pricing. Arencibia offered the CS a price of $32,000 per kilogram of cocaine and confirmed that he had an Orlando source who could provide the CS with larger quantities of cocaine, up to 100 kilograms. When the CS asked how much Arencibia was comfortable with selling him, Arencibia and Gallardo stated that their Orlando contacts would sell the CS one or two kilograms of cocaine at first for him to try and, if he was satisfied, they would bring him more—up to possibly five or eight kilograms total—while he waited. The CS stated that he wanted to do business and that he was trying "to get around seven" kilograms. Gallardo responded that the CS could buy three or four kilograms now and, later that day or the next day, buy two, three, or four more.

Still in the car, Arencibia made several phone calls to coordinate with other sources to gather the drugs. Arencibia told one supplier that the CS "wanted five, six, [or] seven" kilograms but would be willing to "start with one so he can check it . . . and . . . figure it out." Arencibia directed the supplier to bring "twenty . . . [s]o that [the CS] can see it and touch it and who knows." While the men waited for Arencibia's contact to get back to him, they discussed Arencibia's and Gallardo's dealings with other drugs, their other contacts for those drugs, how to best smuggle drugs into the country, their upbringing, and the women in their lives, occasionally laughing and joking. The men ultimately decided to end the meeting

6

and consummate the deal another time.  To wrap up, Arencibia said that he would contact the CS when his source got back to him, Gallardo went over logistics for the deal, the CS confirmed the $32,000 price per kilogram for the cocaine, and they discussed the possibility of a lower price in the future.  Subsequently, Gallardo and the CS went to dinner, a bowling alley, and the beach together.

Between April 20 and 26, 2017, Gallardo and Arencibia spoke to the CS via phone calls and text messages.  Gallardo reported to the CS that he and Arencibia located seven kilograms of cocaine in Miami, but the cocaine was not good quality.  Eventually, they agreed to have Gallardo receive five to seven kilograms of cocaine from a source in Orlando and deliver the cocaine to the CS at a hotel in Altamonte Springs, Florida on April 26, 2017.  Gallardo directed the CS to send him a photo of the purchase money and the CS complied and organized the money in $10,000 packages.

## C.    April 26, 2017 Cocaine Transaction

On April 26, 2017, Gallardo, Arencibia, and the CS spoke on the phone to confirm that they were ready to meet.  When the CS inquired about the drug quantity he would be receiving, Gallardo responded that he would bring one kilogram for the CS to sample and then, "if [the CS] like[d] it we'll do it."  The CS then requested that they do the entire drug deal "in one shot."  Arencibia responded that they would do one kilogram first and then, he promised, he would "go and get

7

[the CS] the other one."

Later that day, Gallardo, Arencibia, and the CS met in the Altamonte Springs hotel's parking lot. The CS entered Gallardo's car, while Arencibia parked nearby and stayed in his car. Gallardo notified the CS that he had one kilogram of cocaine in his backpack and that they needed to go to a hotel room so the CS could sample it. The CS asked, "how will we do the other four?" Gallardo assured the CS that the other kilograms of cocaine were nearby and directed that, once the CS tested and approved the one-kilogram sample and showed the purchase money, they would talk to Arencibia about the other kilograms. The CS tried to negotiate for a lower price, but Gallardo stayed firm at $32,000 per kilogram.

The CS then agreed to go to the hotel room to sample the cocaine and reveal the purchase money. Once Gallardo and the CS got out of the car and began walking toward the hotel, officers arrested Gallardo.

Officers seized Gallardo's cellphone and the backpack Gallardo was wearing, which contained a kilogram of cocaine (which net weighed 999.4 grams), duct tape, a razor blade, and an envelope with Gallardo's name on it. After obtaining a search warrant, officers searched Gallardo's phone. That search revealed that, between April 17 and 26, 2017, numerous calls and text messages were exchanged between Gallardo and Arencibia as well as between Gallardo and

8

the CS. The "picture gallery" on Gallardo's phone contained the photos the CS sent him of the stacks of purchase money. The buy money in the CS's photos was "split up into quantities that . . . correspond[ed] with the shipment of multi kilos of cocaine."

### D.    Gallardo's Entrapment Defense[4]

Testifying in his own defense, Gallardo explained that he was a truck driver who did not use drugs, was not a drug dealer, and had never been involved in the "drug world" before. Gallardo admitted his involvement in the instant drug deal with the CS and Arencibia, providing the following explanation.

After coming to the United States from Cuba and moving to Chicago, Gallardo met the CS on his trucking route. In December 2016, Gallardo visited and stayed with the CS and his family. The CS revealed that he was involved in marijuana and cocaine dealing, but Gallardo refused to be involved. During the visit, the CS threatened Gallardo saying, "Now you have seen how I live, what I do and . . . how I make a living. And now, Cuban, if you betray me or if you call the police on me, I will kill you and all of your family."

Gallardo left Chicago and moved to Hialeah, but the CS continued to call and harass him. The CS directed that, if Gallardo did not want to work for him,

---

[4]At trial, Gallardo raised entrapment as a substantive affirmative defense, and the district court charged the jury as to that entrapment defense. On appeal, however, Gallardo raises entrapment only in the form of sentencing entrapment and sentencing factor manipulation.

Gallardo needed to find him someone who would sell cocaine. Gallardo told the CS he did not know anything about the drug business and did not have access to drugs.

In December 2016, Gallardo reached out to his family's neighbors in Cuba for contacts in the United States, and they connected him with Arencibia, who had access to kilograms of cocaine. Gallardo told Arencibia that the CS was his friend so that Arencibia would go along with the deal. At some point between January and April 2017—upon enduring the CS's incessant calls and threats—Gallardo lied and told the CS that he found someone in Miami who had five kilograms of cocaine at $20,000 per kilogram. Gallardo told the CS he had contacts in Florida or Colorado to sell cocaine. The CS continued to call Gallardo through April 2017—although there was a 20-day lapse of time in March where they did not communicate—to hound him about finding cocaine contacts.

Gallardo admitted that he was responsible for arranging for the CS to buy cocaine from Arencibia. Gallardo tried to just pawn Arencibia off to the CS, but Arencibia refused because he did not know the CS and required that Gallardo be a part of the deal. Gallardo acknowledged that he had reported to the CS that Arencibia—with Gallardo's assistance—would supply the CS with seven kilograms of cocaine, although the deal later fell through.

Gallardo had many phone calls and meetings with the CS, but Gallardo

10

thought that Arencibia would do the final deal with the CS. Arencibia, however, required that Gallardo be the one to bring the CS the one-kilogram sample of cocaine, have the CS test it, and cut it for the CS. Believing he "had no other option," Gallardo complied. Gallardo conceded that, at the April 26 deal, the CS asked him for another four kilograms and that Gallardo responded that he would give the CS the drugs when he saw the money.

While, on the recorded phone calls and conversations, Gallardo sounded like he had "drug world" experience, it was all an "act." All of Gallardo's directions during the deal, use of drug lingo, and knowledge of drug prices, drug quantities, and drug-trafficking routes came from what he learned from the CS, Arencibia, his truck routes, and YouTube videos. Gallardo's "contacts" in Tampa, Colorado, and Texas were all made up; the other contacts he referenced were Arencibia's.

According to Gallardo, he only went through with the instant drug deal because he "had no way of saying no to [the CS]." Gallardo was afraid of the CS, but he still had to tell the CS things that would make him seem trustworthy—like that his contacts were not dangerous and would not hurt the CS. Gallardo explained that, if he did not play the part, he would face "consequences" or "end up dead." Although Gallardo initially stated that he acted out of fear of the CS, he later revealed that "it was not that much fear," and that "[i]t was more the fact that he was just insisting with his calls." Yet, Gallardo later said he was afraid of the

11

CS because he could be in a drug gang.  Gallardo never went to law enforcement to report the CS's threats, never blocked the CS's number, and never tried to change his own phone number.

## II.  TRIAL

### A.     Indictment and Plea

Gallardo was indicted along with co-conspirator Arencibia for one count of conspiracy with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846.  Gallardo pled not guilty and proceeded to a jury trial.[5]

### B.     Government's Case-in-Chief

As outlined above, during its case-in-chief, the government presented the testimonies of three law enforcement officers and a DEA forensic chemist, the recorded phone calls between the parties, the audio and video recordings of the meetings between the parties, transcripts of the calls and meetings, and photos of Gallardo, the CS, the scenes of the meetings, and Gallardo's cellphone and backpack and its contents.  The law enforcement officers who testified were: Officer Quintas of the Miami PD; FBI Special Agent Eliud Feliciano; and FBI Special Agent Valenzuela.

---

[5]Co-conspirator Arencibia was scheduled to plead guilty but failed to appear for his change-of-plea hearing and was declared a fugitive.

During a break in Agent Valenzuela's testimony, the defense notified the district court that it had just received a summary of a government memorandum disclosing that the FBI had "deactivated," or discontinued using, the CS. The government read its summary disclosure aloud. The summary disclosed that the FBI decided to stop using the CS in future investigations because, in July 2017, Agent Catherman discussed a potential future case with the CS, and the CS revealed to Catherman that he had trafficked marijuana to unknown individuals whom he now owed money. During the April 2017 events between the CS and Gallardo, Agent Catherman (the CS's handler) did not have this information and only learned it in July 2017. The district court ordered the disclosure of the memorandum itself because it appeared that the CS was involved in an unrelated illegal drug conspiracy after or close in time to the instant April 2017 controlled deal with Gallardo.[6] This conduct went directly to the CS's credibility, and Gallardo's defense was centered around the CS's credibility.

At the close of the government's case, Gallardo moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 based on insufficiency of the evidence, which the district court denied.

---

[6]It is not clear in the record exactly when Agent Catherman or the FBI ultimately sent his July 2017 memorandum to the prosecutor. Catherman never actually testified to whether and when he sent the memorandum to the prosecutor's office. He hinted that he sent the memorandum by testifying that the purpose of the memorandum was to notify the prosecutor's office of the CS's deactivation, as was the FBI's usual practice.

13

**C.    Defense**

In addition to calling Gallardo and a character witness for Gallardo, the defense called FBI Agent Catherman.  The defense elicited from Agent Catherman that: (1) Catherman was the CS's handler; (2) in 2002, the CS was charged with harassment by telephone, which was later dismissed; (3) in this case, the CS was paid $2,000 for travel and $5,000 for services; (4) in early July 2017, the CS called Catherman and revealed his unrelated illegal drug transaction; (5) in that same month, Catherman deactivated the CS as an FBI informant because of the CS's involvement in the unrelated illegal drug transaction; (6) immediately thereafter, Catherman authored an FBI memorandum documenting the CS's deactivation; and (7) the "purpose of the [memo] [was] to notify the federal prosecutor['s] office that that [deactivation] activity took place," as per the FBI's usual practice.  Catherman clarified that the CS made no further contact with Gallardo after the April 26 cocaine deal and, by July 2017, was no longer involved in any aspect of Gallardo's investigation.  Catherman conceded that Gallardo had no prior criminal record, let alone any drug convictions or arrests.

The defense argued that, based on the CS's overbearing and manipulative actions, plus his "unauthorized criminal activity" while working as an FBI informant, the CS had "entrapped" Gallardo to locate cocaine for him to purchase.

14

D.    Government's Rebuttal

In rebuttal, the government recalled FBI Agent Valenzuela for the purpose of introducing two March 13, 2017 photos of the CS on Gallardo's cellphone showing that, despite Gallardo's testimony to the contrary, he indeed met with the CS in Illinois in March 2017.  The defense objected to this rebuttal testimony because Gallardo testified that he remained in contact with the CS after December 2017, and, regardless, the photos could have been sent to Gallardo, rather than taken by him.  The district court allowed the testimony, ruling that the defense's concerns went to the weight of the evidence, not its admissibility.

Agent Valenzuela testified that, upon searching Gallardo's phone, he looked through its "camera roll" folder within the photo gallery, a folder containing photos taken by the phone's camera.  Within the camera roll, Agent Valenzuela discovered (1) a photo of the CS removing ice from the windshield of his car, which had an Illinois license plate, and (2) a photo of the CS's car after the ice was removed.  Agent Valenzuela claimed that clicking on the photos revealed a date stamp of March 13, 2017.

The district court stopped the testimony to address the parties outside the jury's presence.  The district court pointed out that, while Agent Valenzuela was implying that the phone showed that Gallardo had to have physically been in Chicago and taken the photos of the CS's car on March 13, 2017, the jury could

15

not leap to this inference without further explanation because Gallardo could have received the image from another person and saved it onto the camera roll folder in his phone. The district court explained that an image texted from another person's cell phone and saved onto his cell phone would retain the original image's data points. The parties agreed, and the district court permitted the government to clear up the distinction.

Back on the record, Agent Valenzuela conceded he had no idea when the photos were taken and there was no way for him to tell whether the photos were taken on Gallardo's phone. When asked if the photos could have been sent to Gallardo as a text message and saved onto his phone, Agent Valenzuela responded, "Yes, but that would require some manipulation of the data."

Again, the district court recessed to ask Agent Valenzuela how the photos' data would have been "manipulated." Agent Valenzuela explained that, when a photo is taken on one phone and sent to another phone via text, the photo will contain its original data (location, date, and time) and, if saved onto the recipient phone, will retain that original data. Agent Valenzuela did not believe that happened in this case because the two photos of the CS's car on Gallardo's phone did not contain any location data. When the district court asked whether that could be simply because the originating phone had the location services turned off when it took the photo and then sent it to the recipient phone, Agent Valenzuela admitted

16

"[t]hat would be a plausible answer," as he could not know the configuration of the originating phone. Agent Valenzuela confirmed that, contrary to his testimony, he could not actually know whether the photo had been manipulated.

The district court addressed the government and stressed that Agent Valenzuela had just lied to the jury about photo manipulation. In response, the government offered to withdraw the two photos, strike Agent Valenzuela's related testimony, and give the jury a curative instruction to disregard that testimony. When the district court appeared dissatisfied with this remedy, the defense requested that the "government . . . clear this up in front of the jury." The district court replied, "I'm going to trust this guy back in front of the jury? He doesn't seem to know truth from fact. So if I bring him back, somehow I'm going to bolster what? What's he going to say? I lied." The district court explored a potential curative instruction for striking Agent Valenzuela's entire rebuttal testimony, but was also concerned about his credibility in regard to his testimony during the government's case-in-chief. The district court highlighted, "he was on the stand for a day. And I'm now questioning [whether] someone who would act with that little judgment should be allowed to—that the jury should be allowed to use his testimony. I'm really concerned."

On this basis, and picking up on the district court's comments, the defense moved for a mistrial. The district court reiterated its concerns since Agent

17

Valenzuela was more than a fact witness; rather, he was a key witness who also testified about narcotics trafficking and the drug lingo used on the recordings. The district court determined that the best course of action was to prevent Agent Valenzuela from offering further rebuttal testimony, give the jurors a curative instruction, and take Gallardo's motion for a mistrial under advisement.[7] Gallardo did not object.

Once the jury was brought back in, the district court instructed as follows:

> Ladies and gentlemen of the jury, the previous witness does not know where Exhibits 18 and 19 were taken. He has no knowledge concerning the location of the phone or the camera inside the phone on the date these photographs were taken. You are to disregard his rebuttal testimony as a whole.
> I also instruct you that you may not use the witness's rebuttal testimony to determine whether or not the defendant met with [the CS] after December 2016.

There were no objections, and the government rested its case.

Gallardo renewed his Rule 29 motion, arguing that he had been entrapped given the CS's harassing phone calls and threats. The district court denied the motion.

## E.    Verdict

Ultimately, the jury rejected Gallardo's entrapment defense, convicted him,

---

[7]While making no explicit ruling, the district court implicitly denied Gallardo's motion for a mistrial as it proceeded to charge the jury and try the case to a verdict. At sentencing, the district court clarified for the record that it had denied Gallardo's motion for a mistrial.

and specifically found that his offense involved five kilograms or more of cocaine.

## F.    Motion for New Trial

Subsequently, Gallardo filed a motion for a new trial, arguing that the trial evidence supported a finding that he conspired to possess with intent to distribute at most one kilogram of cocaine, not more than five kilograms.  Gallardo stressed that the evidence showed that, despite the CS's repeated requests for more cocaine, Gallardo and Arencibia consistently discussed the sale of only one kilogram for the CS to try, told him that they were unable and unwilling to produce five kilograms, and only brought one kilogram to the April 26 deal.  Any talk of providing multiple kilograms was mere puffery.  Although there could have been future conspiracies for a multi-kilogram deal, Gallardo emphasized that the April 26 conspiracy did not involve multiple kilograms.

In opposition, the government highlighted the recorded phone calls and meetings, as well as Gallardo's testimony, showing that: (1) the CS asked for five to seven kilograms of cocaine; (2) early on, Gallardo told the CS he had access to five or more kilograms of cocaine; (3) Gallardo and Arencibia said the total amount of cocaine would have to be broken up into multiple sales at $32,000 per kilogram; (4) when the CS asked how many kilograms they could get him, Gallardo and Arencibia responded that, once the CS earned the suppliers' trust, they could get him anywhere between 5 and 100 kilograms; (5) on several

19

occasions, Gallardo told the CS that they had found him five or more kilograms of cocaine, but either the deals fell through or the quality was bad; and (6) on the day of the planned drug buy, Gallardo showed the CS the one-kilogram sample of cocaine and insisted that the CS sample the drugs and show him the purchase money. Further, the government had to prove only that there was an <u>agreement</u> for possession with intent to distribute five or more kilograms of cocaine; it did not matter whether the conspiracy succeeded.

After a hearing, the district court denied Gallardo's motion for a new trial, finding that it was not unreasonable for the jury to find that the conspiracy involved five or more kilograms of cocaine because the record was replete with evidence of an agreement between the parties to deliver five or more kilograms to the CS, even if the additional kilograms were to be delivered on a different day than the one-kilogram deal or not at all.

### III.  SENTENCING

Gallardo's presentence investigation report ("PSI") set his base offense level at 30 pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(5) because he was responsible for at least 5 but less than 15 kilograms of cocaine. His total offense level of 30 and criminal history category of I yielded an advisory guidelines range of 97 to 121 months' imprisonment and at least five years' supervised release. Under § 841(b)(1)(A)(ii)(II), Gallardo was subject to a statutory mandatory-minimum

sentence of ten years' (120 months) imprisonment and at least five years' supervised release, with a maximum sentence of life imprisonment. Gallardo objected to the PSI on the grounds that the conspiracy involved no more than one kilogram of cocaine. Given that drug quantity, Gallardo argued that: (1) his base offense level was 24 pursuant to § 2D1.1(a)(5), (c)(8), for at least 500 grams but less than 2 kilograms of cocaine, rather than 30; (2) his advisory guidelines range was only 60 to 63 months' imprisonment instead of 97 to 121 months; and (3) his statutory mandatory-minimum sentence was 5 years' imprisonment and four years' supervised release pursuant to § 841(b)(1)(B)(ii)(II) instead of 10 years' imprisonment and five years' supervised release.

At the sentencing hearing, the district court overruled Gallardo's drug-quantity and related objections, finding that substantial evidence supported the jury's factual finding that the conspiracy involved five or more kilograms of cocaine. Under the applicable advisory guidelines range of 120 to 121 months' imprisonment, both Gallardo and the government requested a sentence of 120 months' imprisonment, the statutory mandatory minimum. The district court sentenced Gallardo to 120 months' imprisonment and 5 years' supervised release. Gallardo preserved his drug-quantity objections and filed this appeal.

## IV. MOTION FOR MISTRIAL

On appeal, Gallardo argues that the district court erred in denying his motion

21

for a mistrial based on Agent Valenzuela's false rebuttal testimony that the photos of the CS's car on Gallardo's cellphone were taken by Gallardo's phone or had been "manipulated."[8]  Gallardo contends that he was prejudiced by this false testimony because Agent Valenzuela was a key government witness who testified about the contents of the audio and video recordings, details the CS had relayed to him, and the meaning of various drug lingo.

A defendant is entitled to a mistrial only if he shows substantial prejudice, meaning that it is reasonably probable that, but for the alleged error, the outcome of the trial would have been different.  United States v. Grzybowicz, 747 F.3d 1296, 1311 (11th Cir. 2014).  Generally, the trial judge is "in the best position to evaluate the prejudicial effect of a statement or evidence on the jury."  Id. (quotation marks omitted).  When the district court gives a curative instruction, we presume that the jury followed it.  See United States v. Almanzar, 634 F.3d 1214, 1223 (11th Cir. 2011).  If the district court gave a curative instruction but refused to declare a mistrial, as the court did here, we will reverse only if the objected-to testimony was so prejudicial that its harm was incurable.  United States v. Melgen, 967 F.3d 1250, 1262 (11th Cir. 2020); see Greer v. Miller, 483 U.S. 756, 766 n.8, 107 S. Ct. 3102, 3109 n.8 (1987); United States v. Valois, 915 F.3d 717, 726 (11th

---

[8]This Court reviews a district court's denial of a motion for mistrial for an abuse of discretion.  United States v. Grzybowicz, 747 F.3d 1296, 1311 (11th Cir. 2014).

Cir. 2019).

As soon as the district court became aware that Agent Valenzuela's testimony was false, it stopped the proceedings and instructed the jury to fully disregard the rebuttal testimony. The district court specified that the jury could not use Agent Valenzuela's testimony to determine whether Gallardo met with the CS after December 2016 because Valenzuela did not know when the photos were taken or the location of Gallardo's phone on the time-stamped date. We presume the jury followed this instruction and disregarded the testimony and exhibits introduced therein. See Almanzar, 634 F.3d at 1222-23.

While Gallardo recognizes that the district court gave a curative instruction, he argues that the instruction did not force the jury to unsee the photographic evidence or unhear Agent Valenzuela's improper testimony. That is not the applicable standard. Instead, Gallardo must show that the harm from Agent Valenzuela's false testimony was incurable. See Melgen, 967 F.3d at 1262. Gallardo has not met this burden.

Agent Valenzuela's testimony failed to accomplish its only goal—to rebut Gallardo's testimony that he had not met with the CS in March 2017—because Valenzuela did not actually know when the photos were taken or the location of Gallardo's phone when the photos were taken. This revelation hurt Agent Valenzuela's credibility rather than Gallardo's. Further, whether Gallardo met

23

with the CS in March 2017 was a collateral matter that was relatively unimportant to the central charge: whether Gallardo conspired to possess with intent to distribute five or more kilograms of cocaine to the CS between April 18 and 26, 2017.  Nothing suggests that the objected-to testimony was so prejudicial that no instruction could cure it.  And although Agent Valenzuela in the government's case-in-chief did walk the jury through the meaning of the lingo used in the recordings, the jury could read the transcripts and understand on their own that the trio were conspiring to sell and purchase cocaine.  For all of these reasons, the district court did not abuse its discretion in refusing to declare a mistrial.[9]

## V.  MOTION FOR NEW TRIAL – WEIGHT OF THE EVIDENCE

Gallardo challenges the district court's denial of his motion for a new trial on the ground that the weight of the evidence established that the object of the cocaine conspiracy involved only one kilogram of cocaine, which would have resulted in a statutory mandatory-minimum sentence of five years' imprisonment

---

[9]In his reply brief on appeal, Gallardo argues—for the first time and as a completely separate issue—that the district court plainly erred in failing to sua sponte grant a mistrial on the basis that Agent Valenzuela improperly testified in the government's case-in-chief regarding his interpretation and opinion as to what certain words and phrases meant in Gallardo's communications with the CS and Arencibia.  Because Gallardo never raised this issue as a separate basis for his motion for a mistrial either in district court or in his initial brief on appeal, we decline to consider it in the first instance.  See United States v. Votrobek, 847 F.3d 1335, 1339 (11th Cir. 2017) (providing that a defendant forfeits an argument he failed to raise below in the district court and we review for plain error only); United States v. Britt, 437 F.3d 1103, 1104-05 (11th Cir. 2006) (explaining that this Court "decline[s] to consider issues raised for the first time in an appellant's reply brief" (quotation marks omitted)).

24

instead of Gallardo's current sentence of ten years for five kilograms.[10]

Upon a defendant's motion for a new trial under Federal Rule of Criminal Procedure 33, the district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). To warrant a new trial under Rule 33, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." United States v. Brown, 934 F.3d 1278, 1297 (11th Cir. 2019) (alteration in original) (quotation marks omitted), cert. denied sub nom. Antico v. United States, __ U.S. __, 140 S. Ct. 2826 (2020). "When reviewing the grant of a motion for new trial, we keep in mind that a district court may weigh the evidence and consider the credibility of the witnesses." Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004). Yet, "we also keep in mind that the court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Id. (quotation marks omitted).

Motions for a new trial based on the weight of the evidence are "not favored" and are reserved only for "really exceptional cases." Brown, 934 F.3d at 1297 (quotation marks omitted). If the evidence is sufficient to convict the defendant, a district court is entitled to grant a new trial only in the "rare case in

---

[10]We review the district court's denial of a motion for a new trial based on the weight of the evidence for a clear abuse of discretion. United States v. Hano, 922 F.3d 1272, 1283 (11th Cir.), cert. denied, __ U.S. __, 140 S. Ct. 488 (2019).

which the evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies." Id. at 1298 (quotation marks omitted). In other words, "courts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies." United States v. Martinez, 763 F.2d 1297, 1313 (11th Cir. 1985).

In his drug-quantity challenge, Gallardo does not argue that the credibility of the government's witnesses was impeached at trial or that the government's case against him was "marked by uncertainties and discrepancies."[11] See id. Gallardo simply contends that—regardless of the CS's repeated, unilateral requests for five or more kilograms of cocaine—the evidence showed that the agreement between Gallardo and co-conspirator Arencibia was to provide the CS with only one kilogram.

A defendant violates § 841(a)(1) when he intentionally or knowingly possesses with intent to distribute a controlled substance. United States v. Achey,

---

[11]To the extent that Gallardo incorporates in his challenge to the weight of the drug-quantity evidence his separate arguments regarding Agent Valenzuela's and the CS's credibility, Gallardo had—and took advantage of—the opportunity to impeach their credibility, any further credibility determination was within the jury's province, and Gallardo has not shown that Agent Valenzuela's or the CS's testimonies were incredible. See United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009) ("Credibility determinations are left to the jury and the jury's verdict will not be disturbed on appeal unless the testimony is incredible as a matter of law," meaning that the testimony "relate[d] to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." (quotation marks omitted)).

26

943 F.3d 909, 913 (11th Cir. 2019), cert. denied, __ U.S. __, 140 S. Ct. 2554 (2020).  In turn, a defendant violates § 846 when he conspires to violate § 841(a)(1).  Id.  To prove a conspiracy, the government must establish: (1) an agreement between two or more persons to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in that agreement; and (3) an overt act in furtherance of the agreement.  Id. at 916.  "The existence of an agreement may be established by proof of an understanding between the participants to engage in illicit conduct," the proof of which may be "provided through circumstantial evidence."  Id. (quotation marks omitted).  Contrary to Gallardo's contention, the government produced ample evidence that, even though the CS was the one pushing for a five-to-seven-kilogram deal, Gallardo and co-conspirator Arencibia agreed on numerous occasions to sell the CS that amount of cocaine.

As early as their first recorded meeting on April 18, Gallardo told the CS he was trying to find a supplier to provide the CS with five kilograms of cocaine. Gallardo reported that he had found a supplier who was ready and willing to provide five kilograms of cocaine, although the deal eventually fell through. Nevertheless, Gallardo promised the CS "20-30 [or] 50 kilograms," and Arencibia promised the CS up to 100 kilograms—once the CS gained Gallardo's suppliers' trust by doing an initial one-kilogram deal.  After soliciting Arencibia, Gallardo

27

told the CS that Arencibia would give the CS "whatever you want."

During their second recorded meeting on April 19, Gallardo confirmed with the CS that Arencibia was on his way to meet with them, knew the CS wanted five kilograms, had five kilograms, and would bring five kilograms. Although Gallardo continued to stress that the CS would have access to larger amounts of cocaine once he gained the suppliers' trust by doing a one-kilogram deal first, subsequent conversations revealed that the ultimate goal was to get the CS his requested five to seven kilograms. Namely, Arencibia offered the CS a price of $32,000 per kilogram; referenced an Orlando source that could supply larger quantities; and assured that the CS could obtain up to eight kilograms total if he first tested one to two kilograms, indicated that he was satisfied, and waited for more. Gallardo agreed, adding that the CS could buy three to four kilograms now and up to four more either later in the same day or the next day. Arencibia then made several phone calls to suppliers asking for "five, six, seven," and up to "twenty" kilograms.

Then, recorded phone calls revealed that, between April 20 and 26, Gallardo communicated to the CS his continued efforts at obtaining five to seven kilograms of cocaine from various sources. They ultimately agreed to have Gallardo receive five to seven kilograms from his and Arencibia's Orlando source and deliver them to the CS on April 26.

During their pre-meeting recorded phone call on April 26, Gallardo twice

28

confirmed that the CS could sample one kilogram and, if he liked it, they would bring the rest—ostensibly the four to six other kilograms the CS had repeatedly asked for. At the final recorded meeting, Gallardo indeed brought the CS the one-kilogram sample for him to test. When the CS pressed about how they would "do the other four," Gallardo once again guaranteed the other kilograms were nearby and that they would talk to Arencibia about those other kilograms once the CS approved of the one-kilogram sample and showed the purchase money.

The jury was entitled to infer that, on April 26, Gallardo and Arencibia—as per their prior assurances—planned to bring the CS the additional four to six kilograms of cocaine once he tested and approved the first one-kilogram sample, but that law enforcement arrested them before they could complete the full five-to-seven-kilogram deal. See Almanzar, 634 F.3d at 1221 ("The jury is free to choose among reasonable inferences to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury."). In this way, there was sufficient evidence for the jury to conclude that: (1) Gallardo and Arencibia entered into an agreement to possess five to seven kilograms of cocaine with the intent to distribute them to the CS; (2) Gallardo was a knowing and voluntary participant in this agreement from at least April 18 to 26; and (3) Gallardo's initial delivery of the one-kilogram sample was the overt act in furtherance of the five-to-seven-kilogram-deal

29

agreement.  See Achey, 943 F.3d at 916.  While Gallardo focuses on the fact that he only had one kilogram of cocaine on him upon arrest, "[t]he elements of conspiracy center on a defendant's agreement to commit a crime and do not require the government to prove the elements of the underlying substantive crime itself." See Brown v. United States, 942 F.3d 1069, 1075 (11th Cir. 2019).

In addition to the above evidence, Gallardo testified that he only agreed to provide the CS with one kilogram of cocaine.  The jury rejected this testimony, as it was entitled to do, and apparently believed the opposite—that Gallardo did in fact agree to provide the CS with the requested five to seven kilograms.  See United States v. Singer, 963 F.3d 1144, 1159 (11th Cir. 2020) ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true" (alteration in original) (quotation marks omitted)); United States v. Shabazz, 887 F.3d 1204, 1220 (11th Cir. 2018) (providing that the jury may "consider that [opposite] inference as substantive evidence of [the defendant's] guilt" (quotation marks omitted)).

In sum, the weight of the evidence sufficiently supported the jury's verdict that the object of Gallardo and Arencibia's conspiracy was to sell the CS five or more kilograms of cocaine.  The district court did not err in denying Gallardo's motion for a new trial.

30

## VI. **BRADY**–**GIGLIO** VIOLATION

For the first time on appeal, Gallardo contends that he is entitled to a new trial based on the prosecution's Brady–Giglio violation. Gallardo has shown that the government failed to disclose to the defense until the third day of trial that the CS was deactivated upon admitting to self-dealing during the same time period as the instant cocaine deal with Gallardo. Because Gallardo never raised this argument in his motion for a new trial, we review the Brady–Giglio claim for plain error.[12]

To establish a Brady violation, the defendant must show that: (1) the prosecution possessed evidence favorable to him, including impeaching evidence; (2) he did not possess the evidence and could not have obtained it with due diligence; (3) the prosecution suppressed the evidence; and, (4) had the evidence been revealed to the defendant, it is reasonably probable that the outcome of the proceeding would have been different. United States v. Stein, 846 F.3d 1135, 1145-46 (11th Cir. 2017). To establish a Giglio violation, the defendant must

---

[12]Typically, we review an alleged Brady–Giglio violation de novo and the denial of a motion for a new trial for an abuse of discretion. United States v. Stein, 846 F.3d 1135, 1145 (11th Cir. 2017). However, when the defendant fails to present to the district court a particular ground for a new trial in his motion, any claim of error on appeal regarding that new ground is reviewed only for plain error. See United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007). Under the plain-error standard, we will not vacate a judgment unless the party demonstrates (1) an error, (2) that is plain, and the error both (3) affected the defendant's substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings. United States v. Hernandez, 906 F.3d 1367, 1370 (11th Cir. 2018).

31

show that: (1) the prosecution knowingly used perjured testimony, or failed to correct false testimony upon learning of its falsity; and (2) the use of such testimony was material, meaning that it is reasonably likely that the false testimony could have affected the judgment. Id. at 1147.

Gallardo has not met the plain-error standard for establishing either a Brady or a Giglio violation. As to Gallardo's Brady claim, there was no error, plain or otherwise, because Gallardo cannot show that it is reasonably probable that he otherwise would have been acquitted. See id. at 1145-46. The government's disclosure of the CS's deactivation occurred on January 31, 2018, which was during its case-in-chief. Then, in his defense, Gallardo used that evidence to his advantage by calling Agent Catherman to reveal the details of the deactivation to challenge both the credibility of the CS and the FBI's decision to use him as a trusted informant. And, in his closing argument, Gallardo used that evidence again to bolster his entrapment defense. The jury thus heard the tardy evidence, which it considered and nevertheless credited the agent's testimony.

Gallardo contends that the late disclosure of the CS's deactivation prevented him from "fully investigat[ing] the issue and utiliz[ing] the information during his cross-examination of the Government's witnesses during [its] case-in-chief" and from arguing in his opening statement that the CS "was a self-dealing drug trafficker." This ignores that Agent Catherman—the FBI Agent who decided to

32

deactivate the CS and wrote the memorandum explaining his decision—did not testify in the government's case-in-chief.  Further, Gallardo has failed to explain what specific testimony he would have elicited or even which government witnesses he would have cross-examined differently if he would have had the deactivation information earlier.  And, we cannot say that, but for Gallardo's inability to highlight the CS's self-dealing in opening statements, the jury would have acquitted Gallardo, especially since he made such an argument in his closing statement.  Indeed, the video and audio evidence against Gallardo, along with law enforcement surveillance corroborating the events, overwhelmingly showed Gallardo's guilt.

As to Gallardo's Giglio claim, there was no error, plain or otherwise, because Gallardo has not alleged, let alone shown, that the evidence of the CS's July 2017 deactivation revealed that any trial testimony from any witness was false or perjured.  See Stein, 846 F.3d at 1147 ("[B]ecause Giglio error is a type of Brady violation, the defendant generally must identify evidence the government withheld that would have revealed the falsity of the testimony."); Ford v. Hall, 546 F.3d 1326, 1331 (11th Cir. 2008) (emphasizing that a Giglio error "occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony" (quotation marks omitted)).

Instead, Gallardo speculates that the late disclosure gave the jurors the initial

33

"impression" that the CS and the information he revealed to the FBI were "credible" and "worthy of belief." This is not the standard under <u>Giglio</u>. Even so, Gallardo directly challenged any such "impression" in his defense and closing argument. More importantly, the government's case-in-chief was based on law enforcement's <u>own observations</u> of the phone calls and meetings between Gallardo, the CS, and Arencibia—via in-person surveillance and audio and video recordings—not the CS's personal debriefs with the FBI. Furthermore, for the same reason his <u>Brady</u> claim fails, Gallardo has not shown that this evidence affected the judgment. <u>See Stein</u>, 846 F.3d at 1147. Consequently, there was no <u>Brady</u> or <u>Giglio</u> error, plain or otherwise, let alone one that affected Gallardo's substantial rights.

## VII.    SENTENCING ENTRAPMENT & SENTENCING FACTOR MANIPULATION

For the first time on appeal, Gallardo also argues that he is entitled to a new trial because the government—through the CS's incessant requests for more than one kilogram of cocaine—improperly engaged in either: (1) sentencing entrapment by pressuring him, as a suspect predisposed for committing a lesser crime, to commit a more serious offense; or (2) sentencing factor manipulation by taking strategic actions or suggesting particular offense conduct in order to effectuate a higher statutory mandatory-minimum sentence. Alternatively, Gallardo argues that, if this Court is not inclined to grant a new trial, it should remand for

34

resentencing based on a drug quantity of one kilogram. Once again, because Gallardo never raised these arguments in his motion for a new trial, we review for plain error.

The district court did not err, plainly or otherwise, by failing to sua sponte grant Gallardo a new trial based on the government's alleged sentencing entrapment or sentencing factor manipulation. Gallardo's sentencing-entrapment claim—that, while he was predisposed to commit a lesser offense, the government entrapped him into committing a greater offense subject to greater punishment—is a nonstarter because "our Circuit does not recognize sentencing entrapment as a viable defense." See United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007).

Although we recognize claims of sentencing factor manipulation, we have never applied it. United States v. Osmakac, 868 F.3d 937, 959 (11th Cir. 2017). Where sentencing entrapment centers on the defendant's predisposition, sentencing factor manipulation centers on the government's conduct. Id. The government engages in sentencing factor manipulation when it manipulates a sting operation to increase a defendant's sentence. Id. Relief is warranted only when the defendant proves that the government engaged in "extraordinary misconduct" that was "sufficiently reprehensible." Id. (quotation marks omitted).

Gallardo's sentencing-factor-manipulation claim wholly fails for several

35

reasons.  First and foremost, the remedy for a successful sentencing-factor-manipulation claim is simply reducing the sentence applied to the defendant's misconduct, not a new trial.  See United States v. Haile, 685 F.3d 1211, 1223 (11th Cir. 2012).  Additionally, this Court has consistently rejected claims based on the government's decision to involve a large quantity of drugs in its sting operation.  See id. ("[W]e have held that the use of a large amount of fictitious drugs by the government in a sting operation does not amount to sentencing factor manipulation."); see, e.g., United States v. Sanchez, 138 F.3d 1410, 1413-14 (11th Cir. 1998) (rejecting such a claim where the government arranged a reverse sting operation in which the defendants voluntarily agreed to participate in the theft of a large amount of drugs because "[t]he fact that the government's fictitious reverse sting operation involved a large quantity of drugs does not amount to the type of manipulative governmental conduct warranting a downward departure in sentencing"); United States v. Lange, 862 F.3d 1290, 1296-97 (11th Cir. 2017) (concluding that the district court did not plainly err in failing to determine sua sponte that the government engaged in extraordinary misconduct when it engaged the defendant in a multiple-drug-transaction sting operation, instead of arresting him after the first offense).  Gallardo points to no controlling precedent holding otherwise.  See Lange, 862 F.3d at 1296 (explaining that error cannot be plain unless precedent from either the Supreme Court or this Court directly resolves the

36

issue).

In any event, the record established that Gallardo was a more-than-willing participant in a conspiracy with Arencibia to arrange for the sale of five or more kilograms of cocaine to the CS. Indeed, Gallardo had several phone conversations with the CS regarding the five-to-seven-kilogram cocaine deal, called numerous suppliers to find the CS five to seven kilograms, solicited Arencibia into the conspiracy, met in person with the CS three times, and coordinated with the CS and Arencibia for the April 26 delivery of the five to seven kilograms. The jury was entitled to disbelieve Gallardo's testimony—that he was not a drug dealer, he did not have drug contacts or access to multiple kilograms of cocaine, and the CS forced his participation by threatening and harassing him—and instead believe the opposite as substantive evidence of Gallardo's guilt. See Singer, 963 F.3d at 1159; Shabazz, 887 F.3d. at 1220. This is especially so given Gallardo's contradictory testimony that he was not afraid of the CS and the evidence showing that Gallardo worked persistently with the CS from at least April 18 to 26, was "very friendly" with the CS, laughed and joked with the CS while discussing personal topics, spent time with the CS at the beach and the bowling alley, explained to the CS how drug deals worked in South Florida, and repeatedly tried to calm the CS's nerves and ensure his safety. Accordingly, Gallardo has shown no sentencing-factor-manipulation error, plain or otherwise.

## VIII.  CHALLENGE TO BASE OFFENSE LEVEL

Finally, on appeal, Gallardo contends that, because there was insufficient evidence that the conspiracy involved more than one kilogram of cocaine, his base offense level should have been 24 under U.S.S.G. § 2D1.1(a)(5), (c)(8), instead of 30 under § 2D1.1(a)(5), (c)(5).[13]  However, because any rational juror could have found that the object of Gallardo's conspiracy involved five or more kilograms of cocaine, the district court did not err in holding Gallardo responsible for that drug quantity at sentencing.  See U.S.S.G. § 2D1.1 cmt. n.5 ("In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense.").  For that reason, the district court did not err in calculating Gallardo's base offense level to be 30 under the sentencing guidelines.  See U.S.S.G. § 2D1.1(a)(5), (c)(5) (providing a base offense level of 30 for drug offenses involving at least 5 but less than 15 kilograms of cocaine).  Gallardo's resulting sentence of 120 months' imprisonment is procedurally reasonable.

---

[13]Generally, we review for clear error the district court's determination of the quantity of drugs attributable to the defendant.  United States v. Almedina, 686 F.3d 1312, 1315 (11th Cir. 2012).  However, when the drug quantity used at sentencing was found by the jury rather than by the district court, we review the jury's finding de novo, asking whether, after viewing the evidence in the light most favorable to the verdict, any rational juror could have found that drug quantity beyond a reasonable doubt.  United States v. Curbelo, 726 F.3d 1260, 1267 (11th Cir. 2013).

## IX.  CONCLUSION

Because Gallardo has shown no error, we affirm his conviction and sentence.

**AFFIRMED.**